RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DAVID SHOEMAKER,

            *Plaintiff-Appellee,*

    *v.*

CITY OF HOWELL,

            *Defendant-Appellant.*

No. 13-2535

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-15135—Lawrence P. Zatkoff, District Judge.

Argued: March 3, 2015

Decided and Filed: July 29, 2015

Before: CLAY, GILMAN, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Marcelyn A. Stepanski, JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, for Appellant. Elizabeth A. Downey, ELIZABETH A. DOWNEY, P.C., Farmington Hills, Michigan, for Appellee. **ON BRIEF:** Marcelyn A. Stepanski, JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, for Appellant. Elizabeth A. Downey, ELIZABETH A. DOWNEY, P.C., Farmington Hills, Michigan, for Appellee. Julie McCann O'Connor, O'CONNOR, DEGRAZIA, TAMM & O'CONNOR, P.C., Bloomfield Hills, Michigan, for Amici Curiae.

      GILMAN, J., delivered the opinion of the court in which SUTTON, J., joined. CLAY, J. (pp. 20–33), delivered a separate dissenting opinion.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge.  Like many American cities, the City of Howell, Michigan requires its property owners to keep their lawns mowed below a certain height.  Violators of the ordinance are charged a fine as well as a fee for the costs associated with hiring a private contractor to mow or otherwise maintain the property.  David Shoemaker, then a homeowner in the City, refused to mow the area between the sidewalk and the street (the curb strip) in front of his house after the City had relandscaped the curb strip against his wishes.  After multiple warnings, the City hired a local contractor to mow Shoemaker's curb strip on two separate occasions and charged him a total of $600.

Shoemaker subsequently filed suit against the City in federal court, asserting violations of both his procedural and substantive due process rights.  The district court granted summary judgment for Shoemaker on both claims.  For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to dismiss Shoemaker's complaint.

## II.  BACKGROUND

### A.      Factual background

In 2003, Shoemaker purchased a house located on the corner of South Elm and East Sibley Streets in the City.  He lived in that house with his minor daughter until he sold the property in 2012.  During this time, the City undertook a citywide project to refurbish and landscape its streets.  This project involved gutter replacement, road repairs, and a widening of the curb strips.  The portion of East Sibley Street adjacent to the Shoemaker residence was among the areas impacted by the City's efforts.  As part of the project, the City removed a tree planted in the curb strip by Shoemaker and replaced it with nine saplings.  Shoemaker claims that when he protested the tree's removal, City workers told him "that's not your property, you have no say on what goes in or out of there."  Upset by the City's unilateral remodeling of the

curb strip, Shoemaker chose to protest the City's actions via civil disobedience: he stopped mowing the curb strip.

On August 17, 2010, the City received a complaint about Shoemaker's lawn. The complaint, which was emailed to Code Enforcement Officer John Donahue, claimed that "My neighbors have not mowed their lawn in weeks—this has happened 4 times already this year. There is going to be a rodent problem shortly if there is nothing done about this." Based on this complaint, Donahue visited the residence and left a door-hanger notice informing Shoemaker that his lawn was in violation of City Code § 622.02 (the Ordinance), which sets forth the duty of property owners and occupants to maintain the vegetation on their land. When Donahue returned to the residence several days later, the lawn and curb strip had been mowed and brought into compliance with the Ordinance.

The Ordinance, first adopted in 1959, prohibits the owner or occupant of any lot in the City from "maintain[ing] on any such lot . . . any growth of weeds, grass or other rank vegetation to a greater height than eight inches." City Code § 622.02(a). It explicitly applies to any land "along the sidewalk, street or alley adjacent to the same between the property line and the curb." A violation of the Ordinance constitutes a municipal civil infraction, which subjects the responsible party to the civil fines set forth in City Code § 202.99. *See* City Code § 622.99. Anyone accused of such an infraction is notified by either a "citation," City Code § 208.02(e), or a "violation notice," City Code § 208.02(f).

Donahue next became aware of tall vegetation on the Shoemaker property the following spring. He mailed Shoemaker a "Notice of Ordinance Violation" letter on May 17, 2011, advising Shoemaker of (a) the alleged violation of the Ordinance, (b) the substance of the Ordinance, (c) the time allowed to remedy the violation (five days), and (d) the various fees associated with noncompliance. That same day, Donahue also left a door-hanger notice at Shoemaker's residence advising him of the violation. Donahue returned a week later to find the grass adequately trimmed.

Shoemaker apparently kept his lawn and the adjacent curb strip in compliance with the Ordinance for several months following the May 2011 violation. On August 4, 2011, however, Donahue again noticed vegetation that was taller than eight inches on the curb strip in front of

Shoemaker's house. As before, Donahue left a door-hanger notice informing Shoemaker of the violation and mailed another Notice of Ordinance Violation on August 9. Donahue returned to the property on August 10 to find that, although the lawn had been freshly mowed, the grass on the curb strip remained in excess of the Ordinance's limitation. When Donahue returned again to inspect the property on both August 16 and 17, the curb strip's vegetation remained uncut.

Donahue then contacted Shaner's Cutting Edge, a local landscaping contractor, on August 17, 2011 and asked the contractor to mow the curb strip in front of Shoemaker's house later that day. Despite Donahue's work order, the contractor had not mowed the area when Donahue returned on August 18. This time Donahue took pictures of the curb strip to document the violation, and he spoke with Shoemaker's daughter about the issue. During the conversation, Donahue gave Shoemaker's daughter another door-hanger notice, this one marked "FINAL NOTICE!"

When Shoemaker learned of Donahue's conversation with his daughter, Shoemaker contacted City Hall to complain about the interaction, which his daughter described as "nerve [w]racking." Donahue later called Shoemaker to "apologize if he intimidated [Shoemaker's] daughter," and the two men discussed the overgrown grass. During that call, Shoemaker insisted that he would not mow the curb strip because he had been told by City employees that the area was the City's property and not his own. According to Shoemaker, Donahue insisted that the property did in fact belong to Shoemaker. The call ended with Shoemaker indicating that he wanted to be ticketed for the violation in order to challenge the Ordinance in court. This was the only conversation that ever took place between Shoemaker and Donahue.

Shaner's Cutting Edge finally mowed the curb strip sometime between August 23 and 25, 2011. The City later charged Shoemaker $150 for the contractor's services associated with mowing the curb strip.

Six weeks later, on October 11, 2011, Donahue again found Shoemaker's curb strip in violation of the Ordinance. As before, he left a door-hanger notice informing Shoemaker of the violation and mailed a Notice of Ordinance Violation the following day. This was the fourth door-hanger notice and the third notification letter that Donahue had addressed to Shoemaker regarding the vegetation issue. Shoemaker again failed to bring the curb strip into compliance,

and Donahue once more hired Shaner's Cutting Edge to mow the area, which the company did sometime between November 1 and 4, 2011. The City charged Shoemaker another $150 for the contractor's services.

Both parties agree that Shoemaker was charged a total of $600 for his violations of the Ordinance. He paid that amount as part of the property taxes due upon selling the house in late 2012. Although the record does not appear to contain an itemized bill, the $600 total apparently includes $300 in fees ($150 for each grass-cutting service) and $300 in fines ($50 for the first infraction and $250 for the second). These charges are consistent with the fee/fine schedule laid out in each of the Notice of Ordinance Violation letters sent by Donahue to Shoemaker.

**B.　Procedural background**

Shoemaker filed suit against the City and Shaner's Cutting Edge in federal court in November 2011, asserting violations of his procedural due process, substantive due process, equal protection, and Fourth Amendment rights. The parties later stipulated to the dismissal of (a) Shaner's Cutting Edge, and (b) the claims based on equal protection and the Fourth Amendment. Shoemaker and the City then filed cross-motions for summary judgment on the remaining procedural and substantive due process claims. After a hearing on those motions, the district court granted summary judgment in favor of Shoemaker on both counts. This timely appeal followed.

## II. DISCUSSION

**A.　Standard of review**

We review de novo a district court's grant of summary judgment. *Keith v. Cnty. of Oakland,* 703 F.3d 918, 923 (6th Cir. 2013). Summary judgment is proper when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, all reasonable inferences arising from the undisputed facts must be drawn in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Shoemaker challenges the constitutionality of the Ordinance on both procedural and substantive due process grounds.  We will address each challenge in turn.

**B.    The City did not violate Shoemaker's procedural due process rights because it provided him with ample notice of the violation and an adequate opportunity to be heard**

### 1.    *Legal standard*

In considering procedural due process claims, we must first determine whether the alleged deprivation is within the ambit of the Fourteenth Amendment's protection of liberty and property.  *Han v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999).  This analysis is simple here because the City acknowledges that Shoemaker had a protected property interest in the $600 that the City charged him for violations of the Ordinance.

We must next determine whether the City afforded adequate process prior to and following the deprivation.  At its essence, due process can be summarized as "the requirement that a person . . . be given notice of the case against him and [an] opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-172 (1951) (Frankfurter, J., concurring)) (internal quotation marks and alteration omitted).

We weigh several factors in deciding exactly how much process is due:

> [1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation[;] . . . [3] the probable value, if any, of additional or substitute procedural safeguards; and [4] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263-271 (1970)).  As the multi-factored test from *Mathews* suggests, the requirements of due process are fluid and fact dependent.  *Id.* at 334 (citing *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)).  Furthermore, pre- and postdeprivation processes should be considered together as a single package:

> The predeprivation process need not always be elaborate, however; the amount of process required depends, in part, on the importance of the interests at stake. . . . Moreover, the sufficiency of predeprivation procedures must be considered in conjunction with the options for postdeprivation review; if elaborate procedures

for postdeprivation review are in place, less elaborate predeprivation process may be required. In some cases, postdeprivation review may possibly be sufficient, and no predeprivation process is required.

*Leary v. Daeschner*, 228 F.3d 729, 742-43 (6th Cir. 2000) (citations omitted); *see also Mathews*, 424 U.S. at 349 (finding that "an evidentiary hearing is not required prior to the termination of disability benefits"); *see also Spinelli v. City of New York*, 579 F.3d 160, 171 (2d Cir. 2009) ("Under the circumstances, . . . the City was not required to provide Spinelli with pre-deprivation due process before suspending her license and seizing her firearms.").

The district court found that the City "fail[ed] to provide any legitimate protection of Plaintiff's property interest" because "[t]he Ordinance is devoid of any mechanism by which a citizen may invoke to seek a hearing before a court or a quasi-judicial board on any issue." In short, the district court held that "the City failed to provide Plaintiff with a meaningful predeprivation or postdeprivation hearing as required under the 14th Amendment." We respectfully disagree with the district court's conclusion for the reasons set forth below.

## 2.    *The City provided Shoemaker with multiple notifications of the Ordinance violation in question*

The record clearly establishes that the City provided Shoemaker with ample notice of the allegations against him. Over the course of 16 months, Donahue warned Shoemaker that he was in violation of the Ordinance on at least six separate occasions. These warnings included four door-hanger notices, three Notification of Ordinance Violation letters, a conversation with Shoemaker's daughter, and a telephone conversation between Donahue and Shoemaker himself. Shoemaker admits that he knew of the charges levied by the City, but he argues that the City failed to notify him about the ways in which he could challenge those charges.

At oral argument, the City conceded that the Notices of Ordinance Violation issued to Shoemaker do not fully comport with the requirements laid out in the City Code. Section 208.07(e) of the City Code mandates that any violation notice include the following details:

> [1] the time by which the alleged violator must appear at the [City of Howell Municipal Civil Infraction] Bureau, [2] the methods by which an appearance may be made, [3] the address and telephone number of the Bureau, [4] the hours during which the Bureau is open, [5] the amount of the fine scheduled for the

alleged violation, and [6] the consequences for failure to appear and pay the required fine within the required time.

The Notices that Donahue mailed to Shoemaker omit all but the final two items on the above list.

Although the City failed to fully comply with its own Ordinance, such a failure "does not . . . automatically translate into a deprivation of procedural due process under the United States Constitution." *See DePiero v. City of Macedonia*, 180 F.3d 770, 788 (6th Cir. 1999) (holding that, although a parking citation failed to comply with state law, a deprivation of procedural due process did not occur because the City provided constitutionally sufficient notice). To satisfy due process under the Constitution, the notice must be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and "must afford a reasonable time for those interested to make their appearance." *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314 (1950). The notices here do just that.

Shoemaker was clearly aware that the City considered him to be in violation of the Ordinance. The mailed notices of violation and the door-hanger notices informed him of the nature of the alleged violation and the relevant section of the City Code. These notices also included the phone number of City Hall. Finally, the notices refer to the City's Municipal Civil Infraction Ordinance, where Shoemaker could have learned about the procedures for objecting to the allegations against him. A simple investigation of the referred-to Ordinances or a call to City Hall would have answered Shoemaker's questions, but he made no such effort. He "should not be able to now use [his] inaction against the [City] in claiming a violation of due process." *See Dubuc v. Twp. of Green Oak*, 406 F. App'x 983, 989 (6th Cir. 2011) (holding that property owners who failed to take advantage of the zoning board's postdeprivation appeals procedures could not claim that those procedures violated due process) (citing *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th Cir. 2004)).

Although the notices in question were not perfect, the Constitution does not require strict adherence to the City's Ordinances. What the Constitution does demand—that the notice as given be reasonably calculated to alert Shoemaker of the charges against him and any avenues

available for challenging those charges—was accomplished by the notices distributed by the City.

### 3. The Mathews *factors indicate that due process was satisfied here*

We next turn to the City's procedures for challenging violations of the Ordinance. In doing so, we must determine if the procedures are constitutionally sufficient under the *Mathews* test.

#### a. *Shoemaker's property interest is relatively minor*

First, the property interest at issue here—$600 in fines and fees over 16 months—is relatively minor. *See Silvernail v. Cnty. of Kent*, 385 F.3d 601, 605 (6th Cir. 2004) (finding that a $25 assessment fee constituted a "minimal" property interest). Shoemaker did not go hungry or lose his house because of the $600 added to his property taxes in fees and fines. *Compare Goldberg v. Kelly*, 397 U.S. 254, 264 (1970) (finding that the plaintiff was entitled to a predeprivation evidentiary hearing because the property interest at issue—welfare benefits—"provide[d] the means to obtain essential food, clothing, housing, and medical care."), *with Mathews*, 424 U.S. at 343 (holding that an evidentiary hearing was not necessary prior to the termination of Social Security benefits, in part because "the hardship imposed upon the erroneously terminated disability recipient . . . is likely to be less than that of a welfare recipient" such as the plaintiff in *Kelly*). In fact, Shoemaker was not actually deprived of his property until he was required to pay the $600 as part of the property taxes due upon the sale of his house in late 2012.

#### b. *There is little risk of erroneous deprivation under the Ordinance*

Moreover, the Ordinance presents a minimal risk of an erroneous deprivation. If the vegetation on the land in question is allowed to grow beyond eight inches tall, then the owner or occupier of that land has violated the Ordinance. Due to this objective, readily ascertainable standard, there is little chance of a wrongful application of the law. *See Sickles v. Campbell Cnty.*, 501 F.3d 726, 730 (6th Cir. 2007) (finding that the risk of erroneous deprivation was "minor" where "[t]he withholding of funds involve[d] elementary accounting that has little risk of error"); *Silvernail*, 385 F.3d at 605 (citing with approval the district court's finding that the

risk of erroneous deprivation was low where "the proof of a bad check violation is the returned check itself").

### c. *More process would add little value*

The ample means of challenging an alleged violation under the laws of the City and the state of Michigan further counsel against the need for additional procedures. Under subsection (e) of the Ordinance, the City is authorized to bring any land in violation of the Ordinance into compliance and charge the land's owner for any associated costs. City Code § 622.02(e). These charges are "either . . . incorporated into a special assessment . . . or . . . entered upon the next tax roll as a charge against such premises and . . . collected [as a] lien." *Id.*

When the fines and fees are processed as a special assessment, Chapter 14 of the City Code requires the City Council to "prescribe a complete special assessment procedure." City Code § 14.5. That procedure is laid out in City Code §§ 892.09-14, and requires that "all persons interested" in any special assessment be notified of the hearing before the Council where they may raise any objections related to the assessments against them. City Code § 829.09. In addition, Chapter 12 details the procedures related to those instances where the fines and fees are entered as liens on the property. Like Chapter 14, Chapter 12 provides for both notice to those impacted and a forum—the Board of Review—where the homeowner may raise any objections to the charges against his or her property. City Code § 12.10.

Michigan law also provides an opportunity for review beyond the City's predeprivation procedures. Article VI, § 28 of the Michigan Constitution provides that

> [a]ll final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

The fees and fines charged to Shoemaker by the City were therefore reviewable in state circuit court. *See Carleton Sportsman's Club v. Exeter Twp.*, 550 N.W.2d 867, 869 (Mich. Ct. App.

1996) (holding that the township zoning board's decision was subject to appellate review by the circuit court pursuant to Article VI, § 28).

Shoemaker argues that we should ignore these procedures, however, because the City failed to raise them in either its briefing below or before this court. These procedures were instead raised by the Michigan Municipal League and others, who filed an amici curiae brief in support of the City. Although we may not consider issues or arguments raised by amici "[t]o the extent that [those issues or arguments] exceed those properly raised by the parties," *Cellnet Commc'ns, Inc. v. FCC*, 149 F.3d 429, 443 (6th Cir. 1998), that is not what is happening here. Rather than raising new issues or arguments, the amici simply augmented the City's position that it did not violate Shoemaker's procedural due process rights because sufficient procedures were in place.

As Shoemaker would have it, however, amici's role would be limited to parroting the briefs of the parties. But if that were true, amici would essentially serve no purpose whatsoever. "The traditional function of an amicus curiae is to assist in cases of general public interest by supplementing the efforts of private counsel and by drawing the court's attention to law that might otherwise escape consideration[.]" *See* 3-28 Moore's Manual—Federal Practice and Procedure § 28.84 (2014). This is exactly what the amici here have accomplished.

### d. Additional process would require additional costs for the City

Finally, the City argues that the burden of added process here would be significant, and that the potential burden "militates against yet more process." Shoemaker, for his part, argues that "if the City simply printed civil infraction tickets and allowed the local district court to handle the matter as it does all other civil infraction[s], the City would not incur much additional cost." Although the City offers little evidence of the burden that additional process might pose, the fees and fines associated with the grass-cutting Ordinance are sufficiently small that added procedural safeguards would quickly outpace the monies collected as a result of enforcing the City Code.

Requiring additional procedures—such as an evidentiary hearing for each unkempt yard prior to the City having it mowed—would thus impose substantial costs with little corresponding

benefit. *See Silvernail v. Cnty. of Kent*, 385 F.3d 601, 605 (6th Cir. 2004); *see also McKesson Corp. v. Div. of Alcoholic Bevs. & Tobacco*, 496 U.S. 18, 37 (1990) ("[A] State need not provide predeprivation process for the exaction of taxes. Allowing taxpayers to litigate their tax liabilities prior to payment might threaten a government's financial security, both by creating unpredictable interim revenue shortfalls . . . and by making the ultimate collection of validly imposed taxes more difficult.").

Taken together, the four *Mathews* factors point to the conclusion that the City provided sufficient process under the circumstances and did not violate Shoemaker's procedural due process rights. Our confidence in the soundness of this conclusion is all the stronger because Shoemaker made clear from the beginning that he had no interest in contesting whether the height of the grass on his curb strip complied with the ordinance. To the contrary, he readily conceded that it did not. The goal of his civil disobedience was instead to test the ordinance's constitutionality, not to dispute his noncompliance with its terms.

But by not disputing the charges against him, Shoemaker is precluded from mounting a procedural-due-process claim against the City, even if a due-process violation had in fact occurred. *See Graham v. Mukasey*, 519 F.3d 546, 549-50 (6th Cir. 2008) ("[T]o establish the requisite prejudice [to support a procedural-due-process claim], he must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of those violations."); *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001) (concluding that where a military student was expelled after admitting that he assaulted his roommate, the student's claim for procedural due process due to lack of notice failed because additional notice would not have allowed him to better defend his claim); *Keough v. Tate Cnty. Bd. of Educ.*, 748 F.2d 1077, 1083 (5th Cir. 1984) ("Keough admitted the charges and therefore his suspension did not result from a procedural due process deprivation."); *Black Coalition v. Portland Sch. Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir. 1973) (declining to order a new hearing because the student had "admitted all of the essential facts which it is the purpose of a due process hearing to establish"). Our dissenting colleague's protestations about the allegedly inadequate notice given Shoemaker thus strike us as particularly unpersuasive in the context of the present case.

**C.     The City did not violate Shoemaker's substantive due process rights because Shoemaker had a shared ownership interest in and the de facto use of the curb strip**

Shoemaker also claims that the City violated his substantive due process rights by forcing him to maintain the curb strip adjacent to his lawn, which he contends is City-owned property. The district court granted summary judgment in favor of Shoemaker on this basis, finding that (a) the City had conceded that it owned the curb strip in front of Shoemaker's house, (b) "the right not to be forced by a municipal government to maintain municipal property" is a fundamental one, and (c) the Ordinance "unconstitutionally infringes" on that right. Contrary to the district court's findings, however, the City never conceded that it is the sole owner of the land in dispute. A more accurate reflection of the City's position is found in its motion for summary judgment, where it discusses the "incremental effort or expense in maintaining [the curb strip] in conjunction with *the rest of [Shoemaker's] property*." (emphasis added).

In fact, under Michigan law, Shoemaker technically owned the property at all relevant times and the City simply possessed a right of way for public use. *See Loud v. Brooks*, 217 N.W. 34, 34-35 (Mich. 1928) (holding that "a conveyance of land bounded on a highway, street, or alley carries with it the fee to the center thereof, subject to the easement of public way"). The reasoning of the district court's opinion relies entirely on the inaccurate determination that the City is the sole owner of the curb strip. Given Shoemaker's shared ownership interest in the curb strip as well as his de facto use thereof, no substantive due process violation occurred.

### 1.     *Legal standard*

This court has referred to substantive due process as "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (internal quotation marks omitted) (quoting Comment, *Developments in the Law—The Constitution and the Family*, 93 Harv. L. Rev. 1156, 1166 (1980)); *see also Zinermon v. Burch*, 494 U.S. 113, 125 (1990). What type of "limitations" the Constitution imposes on such governmental deprivations depends on the nature of the right being deprived. Specifically, "[g]overnment actions that do not affect fundamental rights . . . will be upheld if [ ] they are

rationally related to a legitimate state interest." *Seal v. Morgan,* 229 F.3d 567, 575 (6th Cir. 2000) (citing *Vacco v. Quill*, 521 U.S. 793, 799 (1997)). When government actions do impact an individual's fundamental rights, however, the courts will apply the rigorous strict-scrutiny standard to the alleged deprivation. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993).

The district court acknowledged that "the [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Despite this acknowledgement, however, the district court proceeded to expand the concept by identifying a new fundamental right: "the right not to be forced by a municipal government to maintain municipal property."

### 2.        At all relevant times, Shoemaker had a property interest in the curb strip adjacent to his residence

According to the district court, "the City . . . does not contest that it owns the property at issue." But the court did not cite any evidence to support this finding. To the contrary, the City has consistently maintained that, although it has an easement over the curb strip, it possesses only a shared interest in that land. Because the district court failed to cite any factual support for its finding, we have examined the evidence that Shoemaker marshals in support of his similar argument that "[t]he City has repeatedly admitted that it owns the land in fee."

Our examination reveals that Shoemaker has substantially overstated the evidence in his favor. Two examples are illustrative of this point. First, Shoemaker notes the following response by the City to his motion to compel discovery:

> Initially, Defendant questioned whether Mr. Shoemaker might own all or part of the [curb strip]. However, this is a distinction without a difference in terms of Mr. Shoemaker's duty to maintain the [curb strip]. The City now, after speaking with engineers, does not dispute that Plaintiff does not "own" the [curb strip] at issue.

Second, Shoemaker points to the following interaction at oral argument on the cross-motions for summary judgment:

> [COUNSEL FOR THE CITY]: … [Shoemaker's] responsible to remove [the vegetation] under the Noxious Weed Ordinance and Statute.
>
> THE COURT: On your property?

. . .

> [COUNSEL FOR THE CITY]: On the city property, yes—well, on the public right of way. Your Honor, although the city may own it, it does not have the same kind of ownership rights as a normal person . . . .

Shoemaker argues in his brief that both of these comments prove that the City has "confirmed that [it] owned the property." In reality, however, both statements, though inartful, do not concede the City's exclusive control. Rather, they reflect the complexity of the "bundle of sticks" that constitutes property ownership, *see United States v. Craft*, 535 U.S. 274, 278 (2002) (citing B. Cardozo, Paradoxes of Legal Science 129 (1928) (reprint 2000)), particularly in the context of public use. Shoemaker also ignores the fact that Code Enforcement Officer Donahue told him in August 2011 that the curb strip belonged to Shoemaker and not to the City.

More importantly, the City's position is consistent with the property law of Michigan. Both parties refer extensively to the relatively recent case of *2000 Baum Family Trust v. Babel*, 793 N.W.2d 633 (Mich. 2010). The Michigan Supreme Court in *Baum* dealt with the issue of what effect a public right of way between a lake-front property and the water had on the landowner's rights. After exhaustively reviewing the history of Michigan property law, the Court concluded that "[t]he owner of property abutting upon a street sustains a threefold relation to the street: 1. As one of the general public. 2. As owner of the reversionary interest to the center of the street. 3. As owner of a lot, possessed of the right of ingress and egress to and from the street." *Id.* at 644 (citing *Detroit City Ry. Co. v. Mills*, 48 N.W. 1007, 1010 (Mich. 1891)) (internal quotation marks omitted).

> The Michigan Supreme Court based its conclusion on Michigan's 19th-century plat acts:
>
> [B]y the turn of the last century, this Court had provided ample direction on the nature of the property interest created by the early plat acts. Through a conveyance by a platting statute, the county does not receive title in the nature of a private ownership; it acquires no beneficial ownership of the land and has no voice concerning the use; and it does not possess the usual rights of a proprietor, but rather takes title only to the extent that it could preclude questions which might arise respecting the public uses, other than those of mere passage. Simply put, the law vests the governmental entity with nominal title. We pause at this word 'nominal' to emphasize the obvious, i.e., that the property interest conveyed by these early platting statutes is a fee in name only.

*Id*. at 650 (internal quotation marks, citations, alterations, and emphases omitted). Under *Baum*, therefore, Michigan cities possess "nominal" title to land designated for public use pursuant to one of the plat acts, while the private property owners retain "the usual rights of the proprietor."

This relationship reflects the reality that homeowners like Shoemaker have a special interest in the curb strips adjacent to their houses because these strips of land are, for all practical purposes, simply extensions of the homeowners' lawns. The curb strips also provide a traffic and safety buffer between the street and the rest of the property. In other words, despite the City's right of way over the curb strip for public use, Shoemaker retained both his property interest in and de facto use of the land in question. The error by the district court in reaching the opposite conclusion permeates the remainder of its opinion.

### 3.    *The Ordinance does not impair a fundamental right*

In light of Shoemaker's ownership interest in the curb strip, no fundamental right is impacted by the Ordinance's requirement that he mow and otherwise maintain that land. As discussed above, the Supreme Court has identified very few fundamental rights (none of which are at issue here), and this court has acknowledged the stricture against expanding that brief list. *See Seal v. Morgan*, 229 F.3d 567, 574-75 (6th Cir. 2000) (holding that, although no fundamental right was impaired by plaintiff's expulsion under his high school's "Zero Tolerance Policy," the Policy as applied could not sustain even rational-basis review). This court has summarized the existing fundamental rights as "those protected by specific constitutional guarantees, such as the Equal Protection Clause, freedom from government actions that 'shock the conscience,' and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental." *Bell v. Ohio State Univ*., 351 F.3d 240, 250 (6th Cir. 2003) (internal citation omitted).

On this score, Shoemaker suggests that the Ordinance is somehow un-American. But Shoemaker's argument, like the district court's opinion, relies on the erroneous assumption that the City is the sole owner of the curb strip. Shoemaker specifically compares the requirement that he maintain the curb strip associated with his property to draconian mandatory public-labor measures adopted by regimes in troubled nations such as the Republic of the Congo, Uzbekistan, and Burma/Myanmar. These analogies are almost too outlandish to address. But even more

hyperbolically, Shoemaker argues that the Ordinance "makes the City look like North Korea rather than an American city."

This final comparison should come as a surprise to the citizens of both nations. On the one hand, North Korea is a totalitarian regime that notoriously tortures criminal defendants, executes non-violent offenders, and sends those accused of political offenses to "brutal forced labor camps." Human Rights Watch, *World Report 2015: North Korea*, http://www.hrw.org/world-report/2015/country-chapters/north-korea (last visited July 27, 2015). Ordinances like the one challenged here, on the other hand, are ubiquitous from coast to coast. In fact, a cursory internet query reveals similar ordinances in countless municipalities across the country. *See, e.g.*, San Marino, Cal., City Code § 18.03.05, *available at* http://www.sterlingcodifiers.com/codebook/getBookData.php?chapter_id=57670#740049; Memphis, Tenn., City Code § 48-89, *available at* http://www.memphistn.gov/Government/PublicWorks/CodeEnforcement/CityCodeList/Sec4889.aspx; *Neighbor's Tall Grass Got You Down? Here's What to Do*, Fairfax Cnty., Va., http://www.fairfaxcounty.gov/braddock/newsletter/june2010/grass.htm (discussing Fairfax County Code § 119-3). This suggests that the Ordinance in question is not nearly as conscience-shocking or draconian as Shoemaker would make it out to be. In sum, the Ordinance does not impair a fundamental right and, therefore, rational-basis review is the proper standard.

### 4. *The Ordinance survives rational-basis review because it is related to legitimate government interests*

Where, as here, an ordinance "does not proscribe fundamental liberties," it may "nonetheless violate[] the Due Process Clause where it imposes burdens without any rational basis for doing so." *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 613 (6th Cir. 2010) (quoting *United States v. Comstock*, 560 U.S. 126, 150 (2010) (Kennedy, J., concurring) (internal quotation marks omitted)). "This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances." *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007). "Under rational basis scrutiny, government action amounts to a constitutional violation only if it is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." *Michael v. Ghee*, 498 F.3d 372, 379 (6th Cir. 2007)

(internal quotation marks omitted). "[T]he burden is on [the plaintiff] to show that there is no rational connection between the enactment and a legitimate government interest." *Sheffield*, 620 F.3d at 613 (internal quotation marks omitted).

This court has previously examined a very similar ordinance under rational-basis review in *Rowe v. City of Elyria*, 38 F. App'x 277 (6th Cir. 2002). In *Rowe,* the court upheld the grass-mowing ordinance before it on the grounds that it was rationally related to Elyria's "legitimate governmental purposes relating to aesthetics and vermin control." *Id.* at 282. The City here similarly defends the Ordinance in question by arguing that it advances the following interests: "traffic safety, sanitation, animal and rodent control, protection of property values, aesthetics, and public health, safety, and welfare." Both the Supreme Court and this court have recognized several of these interests as legitimate in other contexts. *See, e.g.*, *Berman v. Parker*, 348 U.S. 26, 33 (1954) ("It is within the power of the legislature to determine that the community should be beautiful"); *H.D.V.–Greektown, LLC v. City of Detroit*, 568 F.3d 609, 623 (6th Cir. 2009) (holding that safety and aesthetics are legitimate governmental interests) (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 509-510 (1981)); *Harris v. Akron Dept. of Public Health*, 10 F. App'x 316, 319 (6th Cir. 2001) (identifying property values, aesthetics, and the health, safety, and welfare of the public as legitimate governmental interests.) We find no reason not to attribute these legitimate governmental interests to the Ordinance in question.

This is not to say that the City's powers in this context are unlimited. For instance, the outcome would likely be different if the City required homeowners to mow large tracts of public land totally unrelated to their individual residences, but such is clearly not the case here. Under Michigan law, ownership of the curb strip in question was shared by Shoemaker and the City, and he had the de facto use of the land. These factors make the mowing burden placed upon him constitutionally acceptable.

Because no fundamental right is implicated by the City's requirement that Shoemaker mow the curb strip associated with his house and because that requirement is rationally related to a legitimate governmental purpose, the Ordinance did not violate Shoemaker's substantive due process rights. The district court's contrary conclusion is erroneous.

**D.     Other potential causes of action**

Shoemaker's briefs touch on other legal questions that ultimately are not properly before us.  For instance, Shoemaker hints that the City acted outside the bounds of its right-of-way easement over the curb strip by removing Shoemaker's tree without compensating him and then replacing it with nine saplings.  But no such claim is before us because he never fully developed it here or below.

Shoemaker also brings up the specter of a potential trespass claim is in his appellate brief, wherein he suggests that "[t]he City either trespassed on private property and relandscaped it in violation of the Fourth Amendment, or it simply changed the plantings on its own property."  But Shoemaker dropped his Fourth Amendment claim before summary judgment below and explicitly disclaimed the notion of trespass during oral argument before this court, stating that "We couldn't bring a trespass claim because it wasn't our property."  We therefore have no need to deal with these issues.

## III.     CONCLUSION

For all the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to dismiss Shoemaker's complaint.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting.   Fundamentally, due process is about fairness with respect to how the government exercises its authority when a person's property rights are at issue.   The Due Process Clause requires, among other things, that the government afford individuals with notice and an opportunity to be heard prior to the deprivation of a protected property interest; due process also requires that government refrain from engaging in arbitrary and capricious exercise of authority that impacts an individual's rights.   The City of Howell in this instance failed to comply with either of these constitutional requirements.

By way of summary, the City informed David Shoemaker that it owned the berm in front of his home—when it sought to relandscape that berm without seeking Shoemaker's advice or consent.   At a later date, the City took the contrary position that Shoemaker was in fact the true owner of that very same berm and demanded that Shoemaker maintain the property, and incur the expense of doing so, as relandscaped by the City without Shoemaker's consent.   After Shoemaker refused, the City billed him for the cost of the berm's maintenance, without affording him an opportunity to contest the purported obligation, which had been unceremoniously decreed by the City.   And when Shoemaker did not promptly honor the disputed bill, the City effectively extorted payment by placing a tax lien on his home.   There is nothing fair about the character or substance of the City's actions in this case; nor is there any fairness to be found in the absolute lack of process afforded to Shoemaker throughout his saga with the City of Howell.   Viewing things differently than the majority, I therefore respectfully dissent.

**BACKGROUND**

Shoemaker purchased his home at the corner of S. Elm and E. Sibley Streets in the City of Howell, Michigan, in 2003.   At that time, the berm that ran along Elm Street was narrow.   Planted on that berm was a large tree.   The berm that ran along Sibley Street in front of Shoemaker's home was also narrow.   Believing that the berms were part of his property, Shoemaker regularly mowed those areas along with the lawn that surrounded his home.   Because

the berms were narrow and unencumbered, Shoemaker only needed to make two passes with his lawnmower to complete the task of keeping those areas well-maintained. The additional effort was minimal.

Beyond simply maintaining the berms, Shoemaker undertook efforts to improve the property surrounding his home. Shortly after moving to the corner of S. Elm and E. Sibley Streets, Shoemaker and his minor daughter selected, purchased, and then planted a five-foot tall red maple tree in the berm running along Sibley. Thereafter, Shoemaker and his daughter watched year after year as this tree grow taller, and Shoemaker continued mowing the grass surrounding his property, until a series of events in 2009 interfered with his interest in maintaining the berms.

In 2009, the City undertook a project to replace certain gutters and to "improve" the berms running alongside the roads. Around the same time that the City was tearing up the existing gutters that were buried along the edge of Elm Street, a large branch broke from the old tree that was situated on that land and crashed on top of Shoemakers van, causing $9,000 worth of damage. Shoemaker contacted the City, believing that the incident had been the result of the nearby construction. He also worried that he might have to remove the tree. But the workers sent by the City to inspect the damage told Shoemaker that he had no say in what happened to the tree because it was not planted on his property, inasmuch as the berm belonged to the City. Following that incident, the City began working on the berm running alongside of Shelby Street, where Shoemaker had planted the red maple tree with his daughter. The City uprooted Shoemaker's maple tree over his objections, again telling him that the property between the sidewalk and the street was owned by the City. The City then increased the width of the berm by narrowing the street with the placement of a new curb further from Shoemaker's home. And on this larger block of grass, the City planted nine saplings; each supported by a web of guidewires. It was only at this point—after his tree had been ripped from the ground and the once narrow berm had simultaneously become wider and more difficult to mow—that Shoemaker determined to stop maintaining the reconfigured and relandscaped strip of land that ran adjacent to the sidewalk on Shelby Street in front of his home.

Subsequently, the City's Code Enforcement Officer became aware that Shoemaker was not mowing the grass on the berm. Finding that the growth on the berm was in violation of City Ordinance § 622.02(a), the Officer warned Shoemaker (by way of several written communications either sent through the mail or affixed to Shoemaker's door) that the City's ordinances required Shoemaker to maintain the property. The provision in question reads as follows:

> a) <u>Cutting and Removal.</u> No owner, lessee or occupant . . . having control of any occupied or unoccupied lot or land or any part thereof in the City, shall permit or maintain on any such lot or land, or on or along the sidewalk, street or alley adjacent to the same between the property line and the curb . . . any growth of weeds, grass or other rank vegetation to a greater height than eight inches on the average . . . . No person shall neglect to cut . . . weeds, grass or other vegetation as directed in this section, or fail, neglect or refuse to comply with the provisions in this section, or resist or obstruct the City Manager or his or her authorized agent in the cutting and removal of weeds, grass and other vegetation.
>
> e) <u>Noncompliance; Remedy of the City.</u> If the provisions of the foregoing subsection are not complied with, the City Manager or his duly authorized representative shall serve notice upon the owner, lessee, or occupant . . . to comply with the provisions of this section. Such notice shall be given verbally to any of such persons or in writing. If in writing, it shall be sent first class mail to the owner of record of the lot or land in question . . . . If the person upon whom the notice is served fails, neglects or refuses to cut, remove or destroy . . . such weeds, grass, trees or other vegetation within five business days form the date of such notice . . . . the City Manager shall cause such weeds, grass, trees and other vegetation to be removed or destroyed and the actual cost of such cutting, removal or destruction, plus an administrative fee of seventy-five dollars . . . shall be certified to by the City Manager or his or her duly authorized representative and shall become and be a lien upon the property on which such weeds, grass, trees and other vegetation were located. A statement for such actual costs plus administrative fee shall thereupon be sent by first class mail to the property owner . . . .

Ordinance § 622.02.

The standoff between the Enforcement Officer and Shoemaker reached its climax in August 2011. On August 18, 2011, after having left several violation notices on Shoemaker's door, the Officer spoke directly with Shoemaker's daughter and left a "final notice" demanding that Shoemaker bring the berm into compliance with the ordinance by cutting the overgrown vegetation. The notice left by the Officer was scant; it included only the fact that the City was

charging Shoemaker with having violated "Ord. § 622.02" for "tall grass + weeds," the anticipated date of reinspection (August 19, 2011), and a phone number for "Code Official" number 24, presumably the Enforcement Officer who scrawled the notice. *See* Appendix I. But most significantly, the letter was absolutely devoid of any indication that Shoemaker had the right to challenge the purported violation, let alone any information regarding how he could initiate such a challenge.[1] *See id.*

Displeased with how the Enforcement Officer had spoken to his daughter, Shoemaker contacted the City, which prompted a return phone call from the Officer on August 23, 2011. The Enforcement Officer apologized for the misunderstanding, but reaffirmed his position that Shoemaker was responsible for mowing the berm. When Shoemaker protested, relaying the message conveyed to him by City workers—namely, that the land was not Shoemaker's property. The Officer "concurred" with that assessment, but maintained his position that maintenance of the land was nonetheless Shoemaker's responsibility alone. (R. 26-12, Officer's Notes, PGID 651). Shoemaker asked to be ticketed so that he could challenge the ordinance as applied to him under these circumstances. Notably, the letters that the Enforcement Officer had previously sent to Shoemaker indicated that a ticket would be issued upon the failure to mow the disputed property. Yet, instead of issuing a ticket, the Officer sent Shoemaker an invoice for $150 (inclusive of administrative fees) after having directed the City's contractor to mow the berm.

This process repeated itself in October 2011. The vegetation growing on the disputed strip of property became unkempt, the Enforcement Officer sent another letter to Shoemaker, and he again directed the City's contractor to mow the property for the exorbitant price of $75. The Enforcement Officer thereafter sent Shoemaker an invoice for $450, a price that included a $250 civil fine on top of a $75 administrative fee.[2] The invoices sent to Shoemaker, like each of the letters and the door hanger notices delivered before them, lacked any indication that Shoemaker

---

[1]The Code Officer had twice sent a more detailed letter explaining the substance of § 622.02 in both May and August 2011, and explained the potential consequences of any failure to comply. But this letter, if it was received, also failed to provide any information about how a violation or the statute itself as applied to Shoemaker could be challenged before the City.

[2]This time around, the contractor not only trimmed the disputed area, he also entered into Shoemaker's gated and fenced-in backyard to indiscriminately mow the entire property, including mowing over Shoemaker's well-maintained plants and his strawberry patch.

could challenge the purported violation of the ordinance or, in the alternative, challenge the ordinance itself (as applied to him). *See* Appendix II.**³** Moreover, the invoices certainly offered no information as to how any challenge could be initiated. *See id.* The invoices simply demanded payment.

When Shoemaker refused to pay the invoices, a $600 charge was added to his property taxes as a lien against his home. But Shoemaker, like many Americans, had a mortgage on his home. And as is common with home mortgages, a copy of Shoemaker's tax bill was sent directly to the bank that held the mortgage. Shoemaker had no opportunity to contest the charge because the City's extortion was completed when the bank paid the additional sum from Shoemaker's mortgage escrow account that was reserved for his property taxes. Fearing that the City would next require him to maintain some other property, the existence of which could be purported to give him some marginal benefit, Shoemaker sold his home at a loss and removed himself from Howell, the City where he had gone to high school and college, and where he had lived for most of his life.

**DISCUSSION**

**I.      Procedural Due Process**

Procedural due process, at a minimum, requires that the government, prior to depriving an individual of a property right, provide the affected individual with notice of the charges and a meaningful opportunity to contest the factual basis for those charges. *Morrison v. Warren*, 375 F.3d 468, 473 (6th Cir. 2004) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). The notice commanded by due process requires more than the mere indication of the government's intent to act against the affected individual; it must be must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. The "right to be heard has little reality or worth unless one is informed" of his ability "to appear or default, acquiesce or contest." *Id.*

---

**³**Only the first invoice appears on the record.

The majority contends that Shoemaker's claim is doomed simply because he failed to dispute *one aspect* of the charges against him—the height of the grass—and, in support of this plainly faulty contention, the majority cites a string of irrelevant out-of-Circuit cases that fail to support the majority's position. *See* Maj. Op. at 12. Due process requires an opportunity to be heard with respect to *all* of the materially relevant "disputed issues of fact" that form the basis for the charges. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 590 (1972); 16C C.J.S. Constitutional Law § 1495 (2015) ("Due process of law implies the right to contradict by proof every material fact which bears on the question of right involved."). Shoemaker was willing to mow the grass, so long as he owned the berm. He proved that point by mowing the grass up until the City dictated that it was the true owner of that property. It is beyond questioning that Shoemaker disputed the charges against him, inasmuch as he denied ownership over the property after the City had summarily taken the property, therefore making him not responsible for cutting the overgrown grass. For that reason, the City was required to afford him adequate notice and a meaningful opportunity to be heard. The City failed with respect to both of those obligations.

**A.    Insufficient Notice**

The panel's inquiry into this case should have ended with the insufficiency of the notice provided by the City, before even considering what process was required under *Mathews v. Eldridge*, 424 U.S. 319 (1976). Quite frankly, it is completely baffling as to why the majority pronounces that "[t]he record clearly establishes that the City provided Shoemaker with ample notice of the allegations against him," as if notice of the allegations on their own could satisfy due process. *See* Maj. Op. at 7. The notice itself was clearly deficient because it was not "reasonably calculated," under any circumstances, to "afford" Shoemaker "an opportunity to present [his] objections." *Mullane*, 339 U.S. at 314. None of the correspondences or notices of violation mentioned the right to challenge the charges, let alone how such a challenge could be initiated. Nonetheless, the majority seeks to cure this constitutional deficiency by postulating that "[a] simple investigation of the [City Code] or a call to City Hall would have answered Shoemaker's questions, but he made no such effort." Maj Op. at 8. There are a couple of problems with this argument, which will be addressed in turn.

The first and the most obvious problem with the majority's attempt to excuse the constitutional deficiency of the City's notice is that Shoemaker did in fact call City Hall. Moreover, he attempted to dispute the factual basis for his violation, and he asked for a ticket so that he could challenge the purported violation in court. But the City neither offered him that opportunity nor informed him of any additional process that was available to him and that he was due.

My second concern with the majority's position is that because this notice is so disconnected from the opportunity to be heard, such that the receiving party is left searching for basic answers with respect to his right to challenge the government action, it no longer serves the vital purpose of the notice required by due process. *See Mem. Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 15 (1978) ("The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.'").

Shoemaker was neither informed of, nor given any opportunity, to challenge the application of the ordinance to his circumstances. This lack of meaningful notice was constitutionally deficient. *See Zilba v. City of Port Clinton, Ohio*, 924 F. Supp. 2d 867, 884 (N.D. Ohio 2013) ("[T]he only semblance of process Defendant provides is the right to refuse to pay [the ticket]—intentionally committing a minor misdemeanor when the initial offense was not criminal . . . . Defendant provided . . . no indication the ticket could be challenged . . . ."). The Enforcement Officer in this case simply repeated his assertion that Shoemaker was responsible for mowing the grass on the disputed property and that the vegetation on that strip of land had grown too tall. Under the Fourteenth Amendment, this was no notice at all.

**B.    Insufficient Process**

Failing to recognize that notice requires more than simply advising an affected individual that the government plans to deprive that individual of some property interest, the majority proceeds to conduct a deeply flawed analysis of what constitutes sufficient process under the circumstances presented by this case.

The City made only one argument in its briefing as to why it satisfied the strictures of procedural due process. In the City's own words: "Not only did [Shoemaker] receive actual

notice of the violations, but he also received all of the process he was due," because he had "an opportunity to be heard," inasmuch as the City's "Enforcement Officer . . . addressed his concerns and explained [the City's position]," with respect to who should mow the berm, when Shoemaker called City Hall to complain. Appellant's Br. at 35–36. This so-called "process," far shy of a formal hearing, was obviously deficient for the simple reason that due process is not satisfied by the use of an adjudicative hearing or review that is conducted by the same government official who was responsible for enforcing the law that led to the deprivation in the first place. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970) ("[P]rior involvement in some aspect of a case will not necessarily bar . . . [an] official from acting as a decision maker. He should not, however, have participated in making the determination under review."). The phone call between Shoemaker and the Enforcement Officer does not constitute the sort of process required by the Fourteenth Amendment.[4]

Determined to reshape the law of procedural due process, *see Yang v. City of Wyoming, Mich.*, No. 14-1846, 2015 WL 4174760, __ F.3d __ (6th Cir. July 13, 2015) (slip op.), the majority side-steps the fatal flaw in the City's constitutionally deficient argument. Instead of considering the City's theory of the case, the majority turns to the amici and pretends that the primary argument raised by the amici's brief was not waived on account of the City's failure to make that argument itself. The position supported by the amici, however, is not properly before the Court. *See Taylor v. KeyCorp*, 680 F.3d 609, 615 n.6 (6th Cir. 2012) ("[The amicus] asserts that Taylor has standing to pursue her claims, even in the absence of injury, simply because defendants breached duties owed to her pursuant to ERISA. This argument, however, was not raised by the parties in their appellate briefs. Accordingly, we will not consider this issue." (citing *Cellnet Commc'ns, Inc. v. FCC*, 149 F.3d 429, 443 (6th Cir. 1998)). The majority's contention to the contrary—that "the amici simply augmented the City's position that it did not violate Shoemaker's procedural due process rights because sufficient procedures were in place"—is patently untrue. *See* Maj. Op. at 13. Framing the City's position so broadly that it

---

[4]The City's reliance on *Silvernail v. County of Kent*, 385 F.3d 601 (6th Cir. 2004), is misplaced. In that case, the individual was not forced to seek review of a government action with the officer who had determined that enforcement was necessary in the first place. Moreover, the affected individual was provided with a phone number to call for the explicit purpose of challenging "any . . . reason why they should not be required to pay the Government Assessment Fee." 385 F.3d at 605. The apparent purpose of providing the phone number in this case was simply to explain to the affected individual why the City was going to take the action that it was taking.

would encompass any argument in support of finding that the City offered sufficient process, is contrary to binding precedents, defeats the purpose of the waiver rule, and expands the role of amicus curiae beyond recognition. *See United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991) ("[A]micus cannot create, extend, or enlarge issue[s]."); *see also* Barbara J. Fan Arsdale, 4 Am. Jur. 2d § 7 (online ed.) (last updated May 2015) ("In general, an amicus curiae must accept the case before the reviewing court as it stands on appeal, with the issues as framed by the parties. . . . where a party does not adopt an amicus curiae argument in its brief, the argument is waived on appeal.").

Notwithstanding the impropriety of considering the amici-raised argument, the provisions of the City Code highlighted by the amici provide no more bases to find that the City afforded adequate process to Shoemaker before depriving him of $600. In fact, the need to rely on the amici's arguments in this case lays bare the fallacy of the majority's proposition that "Shoemaker could have learned about the procedures for objecting to the allegations against him" by contacting City Hall. Maj. Op. at 8. He did contact City Hall, and the City itself was apparently unaware of any other procedures available to Shoemaker through which he could challenge the violations; the City certainly failed to advise him of any such procedures, and it also failed to apprise the Court of any such procedures in this appeal.

What the amici identify, and the majority relies on, is a maze of City Code provisions that ultimately allow a taxpayer to challenge his or her tax bill. (The majority also discusses the right to challenge a special assessment, which is entirely irrelevant to this case, as the City did not utilize that procedure to deprive Shoemaker of his property.) In any regard, an individual's right to challenge a tax lien placed against his or her home, or their right to challenge a special assessment, does not in practice (and cannot in theory) be a substitute for the right to initially challenge the purported violation that has ultimately resulted in the deprivation at issue. With respect to this case, the inadequacy of this alleged process (whereby Shoemaker could have challenged his tax bill) could not be any clearer. The bill that augmented Shoemaker's property taxes was automatically forwarded to the bank that held his mortgage. The bank presumably increased his monthly payment to insure that his escrow account associated with the property taxes had a sufficient balance. Regardless of whether there was any monthly increase, the bank

ultimately paid Shoemaker's property taxes from the escrow account (including the additional $600). Shoemaker was never afforded *any* opportunity by the City to contest the charges. Shoemaker was unaware of the precise amount of the final bill, but he was ultimately required to ratify the City's extortion when he tendered to the purchasers of his home the required documentation proving that there were no outstanding taxes on the property. The so-called process offered by the City's tax dispute system is blatantly insufficient in this context.[5]

Pursuant to *Mathews v. Eldridge*, 424 U.S. 319 (1976), the sufficiency of process is determined by weighing (1) "the private interest that will be affected," (2) "the risk of an erroneous deprivation through the procedures used," (3) "the probable value, if any of additional substitute procedural safeguards," and (4) "the [g]overnment's interest, including the fiscal and administrative burdens" that additional process might entail. The decision to be made in this case was whether the City could force Shoemaker to mow the disputed property, not whether the City issued an accurate bill for his property taxes. Although consideration of the *Matthews* factors is unnecessary to resolve this case because of the manifest deficiency of the notice offered to Shoemaker and lack of any opportunity be heard in actuality, a review of those factors further illustrates both the necessity of affording sufficient process under these circumstances and the relative ease with which the City could have offered that process.

Contrary to the majority's view, being charged $600 (not to mention having one's well-maintained garden demolished[6]) is not a "relatively minor" expense for the average American.[7] Nor is the risk of deprivation "minimal" simply because it is objectively ascertainable whether or not vegetation has grown to the height of eight inches. *See Zilba*, 924 F. Supp. 2d at 880–84 (involving a citation for parking in proximity to a fire hydrant, which was objectively defined by statute). Moreover, the risk of a wrongful deprivation is particularly great in a case such as this

---

[5]The majority also suggests that Shoemaker was afforded sufficient post-deprivation process because eventually any quasi-judicial state action that affects individual rights can be challenged in the Michigan courts, pursuant to the Michigan Constitution. Under the majority's view, this remedy would all but preclude a court from finding that any administrative action taken by the State, or any of its political subdivisions and the bodies therein, constituted a due process violation.

[6]*See supra* n.2.

[7]In 2012, the median weekly income for a fully-employed individual in the United States was less than $800. *See* U.S. Dep't of Labor, Median Usual Weekly Earning of Full-Time Wage and Salary Workers, Bureau of Labor Statistics, tbl.1, http://www.bls.gov/news.release/wkyeng.t01.htm (last updated Apr. 21, 2015). Demonstrating just how out of touch the majority is with respect to the economic reality faced by many Americans, the majority implied that $25 and $600 are similar financial stakes, even though $600 is 24-times greater than $25.

where the affected individual might never have an opportunity to see the bill, or contest it before payment, because it was forwarded directly to his or her mortgaging bank. And despite the majority's insistence that additional process would be a financial drain on the City because somehow allowing people to challenge tickets issued to them "would quickly outpace the monies collected as a result of" issuing the tickets in the first place, there is absolutely no evidence in the record to support that strained and illogical position. Maj Op. at 11. Cities have not stopped issuing parking tickets (or tickets for a host of other civil infractions) simply because *some people* actually challenge those tickets. There is absolutely no reason to believe that there would be any meaningful increase in overhead when the infrastructure for challenging tickets based on violations of the municipal ordinances is already in place.

The City's purported process, which it apparently failed to recognize as a viable option for an individual in Shoemaker's circumstances, is plainly insufficient to meet the strictures of due process. The notice did not apprise Shoemaker of anything, other than the City's belief that Shoemaker should cut the grass on the disputed property or risk being charged for failing to do so; and the so-called opportunity to be heard was far too disconnected from the alleged violation to be in any way meaningful, even if Shoemaker had been paying his property taxes directly. *See Mem. Light, Gas & Water Div.*, 436 U.S. at 22. The judgment of the district court should be affirmed because the City failed to provide sufficient process before depriving Shoemaker of his rightful property.

## II.     Substantive Due Process

The second issue in this case was also wrongly decided by the majority. Substantive due process guarantees that certain "deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (internal quotation marks omitted). At its core, this constitutional right protects against government incursions on fundamental rights, government actions affecting an individual that "shock the conscience," and government actions that are arbitrary and capricious in nature. *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). The City's actions in this case were arbitrary and capricious because they lacked any rational basis, and therefore, the judgment of the district court should be affirmed on this issue as well.

The majority expends considerable effort attempting to disprove the City's ownership of the disputed berm and prove Shoemaker's partial ownership. That effort is seemingly made in vain. This dispute cannot be determined based solely on the formalistic dogma of property law, which suggests that Shoemaker had some undetermined number of sticks in a much larger bundle (which the City treated as *de minimis*). The determination of this issue, in my view, turns on the reality of Shoemaker's ownership interest and the beneficial use of the berm in question based on the facts before this panel.

I agree with the majority that under Michigan law Shoemaker had no unique rights with respect to the disputed property, other than the right of reversion (once the City has determined that it no longer has a use for public sidewalks and public streets) and the right of ingress and egress in and out of his own driveway. I disagree, however, with the majority's paradoxical conclusion that Shoemaker had a "special interest" in the berm and that he had "de facto use of the land." Maj. Op. at 16. That proposition could not be further divorced from reality. Shoemaker may have initially had a special interest in the berm when he purchased his home and treated the berm as an extension of his property by planting a tree on it. But that relationship ended when the City uprooted his tree, made its own improvements and alterations to the property, and told him that the City was the true owner of that land. The reality of Shoemaker's ownership interest is that, after those events, the City had determined that Shoemaker had no real interest in the berm whatsoever.

Although I agree that the ordinance, as generally applied to the berms running along the side of streets throughout the City, does not inevitably run afoul of substantive due process, the City's actions under these circumstances were violative with respect to Shoemaker because of the way in which the City exploited its presumed ownership interest in the berm. Mainly, the City violated Shoemaker's due process rights by maintaining, on one hand, that Shoemaker had no right to determine the landscaping of that property, while on the other hand, demanding that Shoemaker was solely responsible for its upkeep. It is not the Court's prerogative to answer constitutional questions in the abstract. The majority has been led astray by its concern that the ordinance at issue in this case is "ubiquitous from coast to coast." Maj. Op. at 17. But a decision with respect to Shoemaker does not necessarily implicate the application of every ordinance that

requires homeowners to mow the berms that run adjacent to their property. It is enough to say that on these facts—where the City excavated Shoemaker's tree, replaced that tree with a number of saplings (each requiring a tangle of wires to maintain its upwards growth), demanded that Shoemaker maintain the relandscaped property, and then extracted $600 from his mortgage holder pursuant to the City's property tax lien for his failure to maintain the land over which he apparently had zero control—the City's actions were arbitrary and capricious, and therefore, in violation of Shoemaker's substantive due process rights.

There is no rational basis to support the City's application of the ordinance in the manner that it was enforced against Shoemaker in light of his past dealings with the City respecting this particular strip of land. Contrary to the majority's naked assertion that Shoemaker "had the de facto use of the land," Maj. Op. at 18, the City repeatedly stated (as well as demonstrated through its actions) that Shoemaker had no control over the berm whatsoever. The City's justifications for requiring Shoemaker to mow the berm include: protection of property values, traffic control, rodent control, aesthetics, and public health. Although some of these rationales sound reasonable, none of them speak to the issue of why Shoemaker (as opposed to the City) should maintain the berm if he has absolutely no right to control it and choose which trees are to be planted there. The City argues that the berm is a natural extension of Shoemaker's lawn and that it contributes aesthetic value to his property. However, Shoemaker's appreciation for aesthetics motivated him to plant a red maple tree with his daughter on that berm. The City removed that tree and replaced it with vegetation of its own choosing. Why Shoemaker should maintain that newly configured berm with vegetation not of his own choosing remains a mystery, for which neither the City nor the majority has provided a satisfactory answer.

**CONCLUSION**

For the reasons stated above, I would affirm the judgment of the district court on both issues before the panel.

**APPENDIX I**



Address *121 S Elm*

THE CITY OF HOWELL ORDINANCE OFFICER
FOUND THE FOLLOWING VIOLATION:

*Tall Grass & Weeds        Ord. #622.02*

Date *8-18-11*                    Time *1130*   A.M.
                                              P.M.

This property will be reinspected
*8-19-11* for compliance.

CODE OFFICIAL
*O.H.*
(517) 546-3861

Handwritten notes: *CUT 19 FRI*, *FINAL*, *HAD IT CUT 15TH*

**APPENDIX II**

**City Of Howell**
611 E. Grand River
Howell, MI 48843
(517) 546 3861
(517) 546 6030

Invoice For Enforcement: ED-11-0508
Date: 01/12/2012



Pay by Account In Full

$ 150.00

SHOEMAKER, DAVID
121 S ELM
HOWELL MI 48843

| Invoice Number | Enforcement Numb | Address | Amount Due |
|---|---|---|---|
| 00006168 | ED-11-0508 | 121 S ELM | $ 150.00 |

| Fee Details: | Quantity | Description | Balance |
|---|---|---|---|
| | 1.00 | Mow Grass 471736405020 11-1 | $ 75.00 |
| | 1.00 | Administrative Fee | $ 75.00 |

| Total Amount Due | | | $ 150.00 |
|---|---|---|---|