Harley E. **ROWE**, Plaintiff–Appellant,

v.

**CITY OF ELYRIA, et al.,** Defendants–Appellees.

No. 01–3005.

United States Court of Appeals, Sixth Circuit.

June 6, 2002.

Before GUY and BATCHELDER, Circuit Judges; and WALTER, District Judge.*

PER CURIAM.

Plaintiff, Harley E. Rowe, appeals from the entry of judgment in favor of the defendants the City of Elyria, Ohio; the City Council; Gerald Klein, the Building Director; and Craig Sampson, an employee in the City's Safety Service Department. Plaintiff relies on various incidents of alleged harassment through the City's use of ordinances and regulatory power as the basis for various claims under 42 U.S.C. § 1983. The district court dismissed the City Council because it is not an entity capable of being sued under Ohio law. The court also found that even assuming that the individual council members were being sued, they were entitled to absolute immunity for their legislative activities. The district court granted summary judgment to the defendants on the remaining claims. Finally, the district court also found that claims arising prior to June 29, 1997, were barred by the applicable two-year statute of limitations.

Plaintiff argues on appeal that the district court erred in granting summary

---

* The Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

judgment to defendants with respect to (1) his claims of selective enforcement; (2) his constitutional challenge to the City's "mowing" ordinance; (3) his claim of involuntary servitude; and (4) his claim that the City's employees acted pursuant to municipal custom or policy in violating his constitutional rights. After a review of the record and the arguments presented on appeal, we affirm.

## I.

Plaintiff is the owner of the West River Marathon service station located at 803 West River Road in Elyria, Ohio, as well as a second building located across the street at 800 West River Road. The complaint alleged that the City harassed and selectively enforced its ordinances against plaintiff in violation of 42 U.S.C. § 1983 (counts 1 & 2). The various incidents of harassment are not alleged in chronological order. Plaintiff complains first that he was assessed a $25 charge for each of two false security alarms in January 1997. Plaintiff disputed whether the alarms were in fact "false," but eventually paid the charges.

In January 1999, plaintiff was required to get a demolition permit for the removal of a canopy that stood over the gas pumps when it partially collapsed under the weight of several feet of snow. Plaintiff got a contractor to remove the canopy that day, but did not get a demolition permit. Conceding that he would have gotten a permit if he was aware that one was required, plaintiff nonetheless argues that enforcing the permit requirement after the fact was just harassment.

Plaintiff also complains that the City cited the property at 800 West River Road for property maintenance code violations when the City knew the building would be demolished. Plaintiff purchased the property on January 28, 1998, and admitted that it looked "kind of rough," had peeling paint, and had holes in the parking lot. In November 1998, plaintiff was served with courtesy notice of violations requiring repairs to the parking lot, repainting and removal of graffiti, and repairs to the foundation walls. The City proceeded against the former owner first, then issued a notice of violations against plaintiff in January 1999. Plaintiff was not fined for the violations, the property was renovated, and an ice cream parlor was ultimately opened on the site.

In December 1994, plaintiff received notice concerning violations of the City's signage ordinance. Specifically, plaintiff was contacted about portable signs placed in the "tree lawn" in front of his service station and cigarette advertising signs attached to the fence along the side of the property. Plaintiff voluntarily removed the portable signs, but denied that either the fence or the advertising signs belonged to him. Following correspondence from plaintiff's attorney, the City determined that the fence was City property and removed the signs itself. Although enforcement was threatened, no action was taken.

Plaintiff complains about the City's policy of charging about $70 per year to inspect the gas pumps at his service station. First, plaintiff argues that the inspections prior to 1994 were conducted in the absence of a municipal ordinance on the subject. Second, plaintiff complains that even after there was an ordinance, the City charged for the same inspections that the county did for free. Plaintiff admitted, however, that the City had an interest in regulating the gasoline service stations within its jurisdiction.

Next, plaintiff claims his business was damaged by the closing of West River Road and rerouting of traffic during sewer construction projects and "other activi-

ties." In July 1998, the City closed West River Road to through traffic for sewer work adjacent to the roadway. The station was located on the corner of West River Road and Furnace Road. Furnace Road remained open, leaving access to the station from that direction. Plaintiff believed that the road work could have been done without closing the road and claims lost revenue of $55,000. The closure for "other activities," which is not discussed on appeal, pertains to the City's closing of the street in 1996, 1997, and 1998, from 6:00 p.m. to midnight for the Fourth of July fireworks festivities at the park adjacent to plaintiff's property.

Finally, plaintiff raises several claims relating to the City's mowing ordinance, which requires the owner or occupant of property to ensure that grass and weeds do not exceed a height of twelve inches. The ordinance, adopted in 1996, provides as follows:

### 553.02 REMOVAL OF WEEDS BY OWNERS OR OCCUPANT; FIVE DAYS NOTICE

It is hereby determined that weeds, vetch, grasses, vines, or any other ground cover growing to a height of twelve (12) inches or more is a nuisance. No person, whether owner or occupant, having the charge or management of any lot or parcel of real property situated within the City of Elyria, whether said real property is improved, unimproved, vacant or occupied, shall allow or permit weeds, vetch, grasses, vines, or any other ground cover to grow a height of twelve (12) inches or more. Notice is provided by publication each year, after which the Director of Safety Services may send notice of a violation giving the owner/occupier five days to remedy the situation on his own. If it is not corrected within five days, the City may mow up to a depth of 100 feet at a fee of $200 per hour with a one hour minimum charge.

On September 29, 1998, plaintiff was sent a notice that the grass or weeds at 800 West River Road exceeded twelve inches, and that the City would mow it at a cost of $200 per hour if he did not mow it himself within five days. Plaintiff admitted that he was aware of the ordinance and its application to his property, had no idea whether the grass or weeds at the property violated the ordinance, and did not personally inspect the property. Although plaintiff made arrangements to have the property mowed, it was not completed within five days. The City mowed on October 13 and charged plaintiff $200, which was later reduced to $100 by the City Council Finance Committee. Plaintiff claims that the City's action was taken without sufficient proof of a violation of the ordinance, that the City actually owned the "tree lawn" that was mowed, and that making him mow it subjected him to involuntary servitude.

Plaintiff filed this action in June 1999, alleging selective enforcement in violation of 42 U.S.C. § 1983 (counts 1 & 2); involuntary servitude (count 3); conspiracy to deprive him of his rights (count 4); "waste" by forcing unnecessary cosmetic improvements to the property at 800 West River Road (count 5); unconstitutional taking of property in violation of due process (count 6); declaration that the mowing ordinance is unconstitutional (count 7); and seeking an injunction against harassment by City officials (count 8). Plaintiff requested $2 million in compensatory damages. Defendants filed a motion to dismiss and for summary judgment, which was opposed by plaintiff. On November 30, 2000, the district court issued its opinion and order, which dismissed the City Council and its members and granted sum-

mary judgment to the remaining defendants. This appeal followed.

## II.

We review the district court's decision to grant summary judgment *de novo. Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party, however, may not rest on his pleadings, but must come forward with evidence from which a rational trier of fact could find in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We address in turn the plaintiff's specific claims of error.

### A. Selective Enforcement

■ Plaintiff argues that there were factual disputes concerning his claims of selective enforcement. " 'Sometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination. To address this problem, courts have developed the doctrine of selective enforcement.' " *Gardenhire v. Schubert,* 205 F.3d 303, 318 (6th Cir.2000) (quoting *Futernick v. Sumpter Township,* 78 F.3d 1051, 1056 (6th Cir. 1996)). To prevail on a claim of selective enforcement, a plaintiff must establish three elements:

First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Id.* at 319 (quoting *United States v. Anderson,* 923 F.2d 450, 453 (6th Cir. 1991)). The first element requires " 'that the plaintiff make at least a *prima facie* showing that similarly situated persons outside her category were not prosecuted.' " *Id.* (quoting *Stemler v. City of Florence,* 126 F.3d 856, 873 (6th Cir.1997)). Further, we have recognized a strong presumption that the official has properly discharged his duties, and only clear evidence to the contrary will overcome it. *Id.*

■ In this case, the district court found that plaintiff had not alleged in either the complaint or in response to defendants' motion that he belonged to any identifiable group which has been prosecuted while other similarly situated persons were not prosecuted. As a result, the court concluded that plaintiff failed to make a *prima facie* showing of selective enforcement. Plaintiff argues on appeal that he provided a list of witnesses in his answers to interrogatories that included persons who he believes were not prosecuted under the grass mowing ordinance. Emphasizing that the City chose not to depose these witnesses, plaintiff fails to recognize that it is his burden to come forward with evidence to support his claim of selective enforcement. Providing a witness list in discovery does not suffice. The district court properly granted summary judgment on the selective enforcement claim.

### B. Mowing Ordinance

■ Plaintiff argues that the district court erred by failing to separately discuss his claim that the mowing ordinance was unconstitutional on its face and as applied. In response to defendants' motion, plaintiff asked that the court declare the ordinance unconstitutional because (1) he was forced to mow property owned by the City; (2) the City issued the notice of violation without knowing who owned the property; and (3) the drive-by inspection of properties for compliance with the ordinance violated due process. Since the selective enforcement and involuntary servitude claims are addressed elsewhere, only plaintiff's substantive due process claim remains.

Plaintiff argues that the City's mowing ordinance is similar to the ordinance that was found to be unconstitutional in *Berger v. City of Mayfield Heights*, 154 F.3d 621 (6th Cir.1998). Review of the opinion in *Berger* makes clear that the ordinances are not alike in any material way. For both substantive due process and equal protection challenges to an ordinance, the question is whether a rational relationship exists between the terms of the ordinance and a legitimate governmental purpose. *Id.* at 624.

Without recounting the details of the ordinance at issue in *Berger*, it was critical to the court's decision that an existing mowing ordinance (like the one here) was amended at the behest of the plaintiff's neighbor to require total clear cutting of vacant property to no more than eight inches in height; but only if the property had less than 100 feet of street frontage and a total area of less than one acre. This court found no rational relationship between the clear-cutting requirement and the asserted purpose of discouraging vermin and avoiding damage from falling tree limbs. Even if the ordinance was interpreted as only applying to weeds and debris, which the court indicated would likely avoid the substantive due process problem of the provision not being rationally related to any legitimate health or safety concern, it would still be unconstitutional because its application to an arbitrarily selected segment of the city's vacant lots violated the Equal Protection Clause. *Id.* at 625.

Significantly, the court took care to emphasize that its holding did not invalidate all mowing ordinances.

> Needless to say, this holding does not prohibit properly drawn ordinances from regulating the maintenance of vacant lots when the enactment avoids the arbitrary and capricious terms of the one in question. In fact, we doubt that anyone would contend that [the general mowing provision] alone lacked a rational basis if it uniformly applied to all vacant lots within the City. Rather, it is the arbitrary and capricious burden placed on the owners of the vacant lots covered by [the clear cutting provision] as opposed to "[a]ll other unimproved or vacant lots" covered by [the general provision] that is the primary cause of the constitutional infirmity in the case before us.

*Id.* at 626. In this case, plaintiff makes no effort to articulate how Elyria's ordinance, which applies to vacant, occupied, improved, and unimproved properties alike, is not rationally related to a legitimate governmental purpose. Further, we are not persuaded that the fact that the ordinance may have been applied to the tree lawn area of the property, which may or may not have belonged to the City, affects the rational relationship between the ordinance and the City's legitimate governmental purposes relating to aesthetics and vermin control.

Plaintiff argues next that even if the ordinance is rationally related to a legitimate governmental concern, it is unconsti-

tutional as applied because enforcement was undertaken in an arbitrary and unreasonable manner. Specifically, plaintiff challenges the practice of having the enforcement officer drive by the parcel and decide whether the height of the grass exceeded twelve inches and had to be cut. This manner of enforcement, plaintiff claims, allows room for error. Plaintiff offers no authority to support his conclusion that it is constitutionally unreasonable to determine compliance in this manner. We find that it is not.

## C. Involuntary Servitude

■ Plaintiff challenges the dismissal of his claim that enforcement of the mowing ordinance subjected him to involuntary servitude in violation of the Thirteenth Amendment of the United States Constitution. Plaintiff claims that forcing him to mow the grass in the tree lawn or pay a fine may be fairly characterized as a "badge or incident of slavery." *See City of Memphis v. Greene,* 451 U.S. 100, 124–26, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981) (impact of closing street is routine burden of citizenship, not a violation of the Thirteenth Amendment). Plaintiff continues to rely on *Callaghan v. Department of Fire,* 385 So.2d 25 (La.App.1980), in which the court found that imposing discipline in the form of ordering a firefighter to work 24 hours without pay as a condition of reinstatement constituted involuntary servitude. We agree with the district court that *Callaghan* is not analogous to this case.

Further, *Callaghan* is not particularly persuasive in light of the subsequent decision in *United States v. Kozminski,* 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988), in which the Court addressed the meaning of the term "involuntary servitude" under the Thirteenth Amendment and 18 U.S.C. § 1584. The Amendment

was not limited to the abolishment of African slavery, but "the phrase 'involuntary servitude' was intended to extend 'to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results.'" *Id.* at 942 (citation omitted).

Rejecting a broad construction of the phrase, the Court in *Kozminski* held that "only situations involving the compulsion of services 'by the use or threatened use of physical restraint or injury, or by the use of threat of coercion through law or the legal process' constitute 'involuntary servitude' prohibited by § 1584 and the Thirteenth Amendment." *Buchanan v. City of Bolivar,* 99 F.3d 1352, 1357 (6th Cir.1996) (quoting *Kozminski,* 487 U.S. at 948, 952). The Court in *Kozminski* offered the following insight:

> Our precedents reveal that not all situations in which labor is compelled by physical coercion or force of law violate the Thirteenth Amendment. By its terms the Amendment excludes involuntary servitude imposed as legal punishment for a crime. Similarly, the Court has recognized that the prohibition against involuntary servitude does not prevent the State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties [*e.g.,* jury service, military service, and roadwork].

487 U.S. at 943–44. While we have not located any cases discussing the imposition of charges for failing to maintain property, we conclude that even if the tree lawn is owned by the City enforcement of the mowing ordinance does not involve the kind of compulsion that would constitute involuntary servitude under the Thirteenth Amendment.

## D. Custom and Policy

■ To establish municipal liability under § 1983, plaintiff must demonstrate

that the City itself caused the constitutional deprivation. *See Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff argues that the long list of incidents of selective enforcement of various ordinances constitutes a custom or policy. Having found that plaintiff was unable to demonstrate the alleged constitutional violations, the City cannot be held liable under § 1983 for the actions of its employees. *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). Finally, since plaintiff has not shown that the mowing ordinance is unconstitutional or subjected him to involuntary servitude, we need not determine whether the City Council acted as a "final policymaker" by enforcing the ordinance against plaintiff.

AFFIRMED.