[Cite as *State v. Nelson*, 2017-Ohio-6883.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 104795

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DONTE B. NELSON

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-598018-A

**BEFORE:** Boyle, J., Kilbane, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** July 20, 2017

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
2077 East 4th Street, Second Floor
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:   Andrew F. Rogalski
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

**{¶1}** Defendant-appellant, Donte Nelson, appeals from a judgment convicting him of sexual battery and abduction.   He raises four assignments of error for our review:

> 1. The manifest weight of the evidence did not support a conviction for either sexual battery or abduction.

> 2. The trial court acted contrary to law, committing plain error, in finding appellant guilty of an offense that as a matter of law was not a lesser included offense of kidnapping.

> 3. Insufficient evidence supported a guilty finding for abduction as a felony of the second degree.

> 4. The trial court erred in imposing court costs on appellant without informing him of the cost and giving him an opportunity to object.

**{¶2}** After review, we find merit to Nelson's third assignment of error.   We agree with Nelson that there was insufficient evidence of second-degree felony abduction, but we do find sufficient evidence of third-degree felony abduction, and thus, we modify his finding of guilt as to abduction.   We find no merit to his remaining assignments of error.   We therefore affirm in part, reverse in part, and remand for the trial court to modify Nelson's finding of guilt with respect to abduction to a third-degree felony under R.C. 2905.02(B) and 2905.02(A)(2).

**I. Procedural History and Facts**

**{¶3}** In August 2015, Nelson was indicted on two counts: rape in violation of R.C. 2907.02(A)(2), a first-degree felony, and kidnapping in violation of R.C. 2905.01(A)(4), with a sexual motivation specification, also a first-degree felony.   Nelson

pleaded not guilty to the charges and waived his right to a jury trial. The following facts were presented to the trial court.

{¶4} A.J., the victim, testified that in July and August 2015, she lived with her friend, LaRicha, on Loop Avenue near West 28th Street, in Cleveland, Ohio. A.J.'s ex-boyfriend, Terrence, was also "staying" there, as well as LaRicha's boyfriend. A.J. said that she was not working at that time; she supported herself by donating plasma.

{¶5} A.J. testified that on July 31, 2015, she spent the entire day babysitting. Later, around 1:30 a.m., she and LaRicha and others were all sitting around talking. At some point, A.J. and Terrence began arguing, so A.J. texted her friend, James Shafer, to come and get her. A.J. left LaRicha's around 2:00 a.m., and began walking to the corner of West 28th Street and Division Avenue because that is where Shafer told her he would meet her.

{¶6} Although the corner of West 28th Street and Division Avenue was less than a block from LaRicha's place, A.J. said that it took her about 15 minutes to walk there because she was walking slowly and talking to Shafer the whole time. Once A.J. got to the corner, she said that she had just gotten off the phone with Shafer when she realized that she developed an urgent need to urinate. A.J. explained that about three days before that night, she had been diagnosed with a urinary tract infection ("UTI"), which caused her to have to urinate frequently and caused her pain if she was not able to relieve herself. A.J. saw two men, a taller one and a shorter one, sitting on a porch across the street, so she walked over to them and asked them if she could use their restroom. The taller man

was later identified to be codefendant, Damontae Ruffin, and the shorter man was identified to be Nelson.

{¶7} A.J. testified that the men said that she could use their restroom. Ruffin got up to show A.J. where the restroom was. A.J. said that when they got to the restroom, she walked in and "the next thing she knew," the men walked in the restroom behind her. One of the men closed the door and locked it. A.J. turned on the light when she walked in, but the men turned it off. A.J. said that Ruffin took her top and her bra off and pulled her pants and underwear down to her ankles. According to A.J., Ruffin bent her over the toilet, and as he was standing behind her, he "stuck his [penis] in [her]." She said that she kept telling him "no," but he kept doing it. A.J. testified that as Ruffin was raping her from behind, first in her vagina and then in her anus, Ruffin also made her give oral sex to Nelson, who was sitting on the sink, at the same time. A.J. testified that she did not know if Ruffin ejaculated, but she knew that Nelson did because they would not let her stop giving oral sex to Nelson until "he came." At some point, Ruffin left the restroom. After Nelson ejaculated, he said that he was going to get his "buddy," and she told him "no," and she got dressed and ran out of the house.

{¶8} A.J. testified that she was in the restroom with the two men for about 30 minutes to one hour. She said that the entire time she was trying to get away from them. She kept trying to put her clothes back on, but they prevented her from doing so. She also kept trying to grab her cell phone, but they kept taking it from her. A.J. testified that Shafer was "blowing up [her] phone," by calling her and texting her, wondering

where she was.

{¶9} A.J. testified that she did not see anyone else on the porch or in the house, nor did she hear anyone else in the house.

{¶10} Once A.J. got outside, she called Shafer and told him that she had been raped by two men. Shafer told her to call 911 and then he called LaRicha. LaRicha left her apartment and walked to meet A.J. at the corner of West 28th Street and Detroit Avenue. LaRicha called 911. Both LaRicha and A.J. talked to the 911 operator. A.J. told the 911 operator that she had just been raped. A.J. said that she was scared and nervous. She was also in pain; her pelvis and her jaw hurt. A.J. also told the 911 operator that she was wearing a pink and black T-shirt, black leggings, and white tennis shoes.

{¶11} Police arrived first, and then an ambulance. By the time she was talking to the paramedics, A.J. said that she had calmed down because she felt safe at that point. Before going to the hospital, she got in the back of a police car and showed them the house where she had been raped. She watched as police went in the house and brought people outside. She told police that the first man they brought out was one of the men who raped her; it was Nelson. Police brought others out of the house too, but none of them was the other man who raped her. A.J. said that she started "freaking out" when she saw police bring Nelson out of the house. A.J. then went to the hospital, where a sexual assault nurse examiner ("SANE") nurse completed a rape kit.

{¶12} Twelve days after the rape occurred, A.J. said that she moved to Michigan,

which is where her family lived. She and LaRicha had a falling out soon after the rape, but that is not why she moved. She said that she moved because of the rape. She then moved to Columbus for a short time, and then back to Cleveland three weeks before trial. She was seeing a counselor in Cleveland and had been diagnosed with post-traumatic stress disorder.

{¶13} On cross-examination, A.J. agreed that according to Google maps, the distance from LaRicha's house to the house where the rape occurred (on West 28th Street), was a distance of 449 feet, or a "two minute" walk. She further agreed that her phone records did not establish that she talked to Shafer for 15 to 20 minutes as she was walking from LaRicha's house to the corner of West 28th Street and Division Avenue on the night of the rape. Instead, the records showed that she called Shafer at 2:28 a.m. and talked to him for three minutes. And then, at 3:21 a.m., she called him again; they talked for ten minutes.

{¶14} A.J. admitted that she did not yell or scream during the rape. A.J. further agreed that when the detective asked her "they didn't promise you money, not give it to you, and now you're pissed off[,]" she replied, "Nope. If * * * they would have promised me money and not given it to me, I would have just brushed it off like whatever."

{¶15} A.J. also admitted that her current boyfriend was LaRicha's cousin, Andre Bello, who had been convicted of promoting prostitution.

{¶16} A.J. said on cross-examination that she had previously been diagnosed with

schizophrenia, and that she had not been taking her medications at the time of the rape. She further agreed that she was not able to use the restroom from the time she first approached the two men on the porch until almost 5:30 a.m. when she got to the hospital.

{¶17} Officers Todd Esson and Kevin Berigan were the first to respond to the corner of West 28th Street and Detroit Avenue, where A.J. and LaRicha were waiting; they received the call at 3:51 a.m. Officer Berigan was driving, and Officer Esson was a passenger. Both officers testified that A.J. told them that she had been raped by two men and took them to the house where she said the men had raped her. The officers stated that A.J. did not appear frightened, although she cried when police brought Nelson out of the house. The officers' body cams were played in court. Essentially, A.J. told police the same version of events that she testified to at trial.

{¶18} On cross-examination, the officers agreed that A.J. did not have any visible injuries and did not appear to be struggling.

{¶19} Anthony Sessin, a paramedic who responded to the call, explained that when he arrived, A.J. told him what had happened to her. He read the narrative that he wrote in his report according to what A.J. told him, which again, was the same version of events that A.J. testified to at trial.

{¶20} Kristina Jones, a SANE nurse, testified that she completed the rape kit on A.J. When A.J. arrived at the hospital, she reported that she had a UTI and had been prescribed Cipro for it three days before the rape had occurred. Jones stated that A.J. did not have any vaginal or anal tearing, but said that did not mean she had not been

sexually assaulted for someone her age. She collected swabs from A.J.'s mouth, vagina, and anus. Jones read her narrative in court regarding what A.J. reported to her on the morning Jones examined her. A.J. reported the same version of events to Jones as she testified to at trial.

{¶21} Laura Evans, a forensic DNA analyst at the Cuyahoga County Medical Examiner's Office, testified that the swab from A.J.'s mouth showed signs of semen being present, but there was not enough to test DNA. The swabs from A.J.'s vagina and anus matched Ruffin's DNA.

{¶22} Detective Sharon Johnson of the Cleveland Police Department's Sex Crimes Unit testified that when police first brought Nelson out of the house on West 28th Street, he asked police why he was being arrested. When police told him that it was because he had sexually assaulted someone, Nelson responded that he did not sexually assault anyone, and that "I didn't touch that white girl." The following day, when Nelson met with Detective Johnson, he admitted that A.J. had given him oral sex, but stated that it was consensual.

{¶23} At the close of the state's case, Nelson moved for a Crim.R. 29 acquittal, which the trial court denied.

{¶24} Nelson presented three witnesses on his behalf, four including himself. Nelson's sister testified that she was the leaseholder of the house where the incident occurred. She explained that on the night of July 31, 2015, there were many people at the house, including her father, her brother, her children, and a cousin who was "passed

out" on the couch. She said that she did not hear anything in the bathroom that night.

{¶25} Shafer testified that he was not really friends with LaRicha or A.J. He said that although he had known LaRicha for three years, he had only seen her seven times in those three years. He stated that A.J. had called him on the night (of the rape) around 2:00 or 2:30 a.m., but he denied that he ever intended to pick her up at that time. He testified that he did not call or text A.J. that night. Shafer said that he had to work at 10:00 a.m. the following day, so he never intended to pick A.J. up that night. He said it was "crazy" that A.J. even called him to come and get her.

{¶26} On cross-examination, Shafer admitted, after reviewing A.J.'s cell phone records, that he actually called A.J. first July 31, 2015. He further admitted that the records showed that he and A.J. had either called or texted each other 80 to 100 times that day and the following day.

{¶27} LaRicha testified that in the early morning hours of August 1, 2015, Shafer called her to tell her that A.J. had been raped. She met A.J. at the corner of West 28th Street and Detroit Avenue and helped her call 911. LaRicha testified to what A.J. told her that night, which was essentially the same version of events as A.J. testified to in court. LaRicha said that she knew A.J. had a UTI infection at that time because LaRicha had taken her to the doctor three days before the rape occurred.

{¶28} LaRicha testified that A.J. lied "all of the time." LaRicha stated that she would not be surprised to learn that A.J. had sex with total strangers because A.J. brought strangers to her house to have sex. LaRicha said that when she met A.J. on the street

that night, A.J. seemed normal, not scared or upset. But LaRicha agreed on cross-examination that she told Detective Johnson four or five days after the rape that A.J. did appear to be scared and upset that night.

{¶29} Nelson testified that he and Ruffin had been hanging out on his sister's porch when they saw A.J. standing on the corner of West 28th Street and Division Avenue. At that time, Nelson said that two women were on their porches directly across the street from his sister's house.

{¶30} Nelson testified that Ruffin began flirting with A.J. while she was on the corner. A.J. walked toward them and asked Ruffin if he had a cigarette. Ruffin did not have one, so Nelson gave Ruffin two cigarettes, one for Ruffin and one for A.J. Nelson said that he went in the house, sat in the kitchen, and talked to his brother, Raymond. Raymond was making jokes about Ruffin flirting with A.J.

{¶31} Nelson testified that Ruffin came in the house and asked Nelson if he could invite A.J. to come in the house; Nelson told him that he did not care. Nelson did not know where Ruffin and A.J. were at first after they came inside because Nelson went back outside for a while. At some point, Nelson went back inside the house. Raymond told Nelson that he heard "moaning" in the bathroom. Raymond left after that.

{¶32} Nelson stated that after Raymond left, Nelson was bored so he knocked on the bathroom door hoping to "get some head." Nelson testified that A.J. opened the door. Nelson saw that A.J. and Ruffin were "having sex." A.J. began to undo the button on Nelson's pants. Nelson said that he assisted her and then A.J. took his

"privates" out of his pants and began to give him oral sex. Nelson testified that it got very warm in the bathroom, so they all took a break. Ruffin went to get a drink of water. Nelson and A.J. had a cigarette. When Ruffin came back, they "started back up again." At some point, Ruffin left. A.J. continued to give oral sex to Nelson until he ejaculated. After that, Nelson said that A.J. began arguing with someone on her phone. Nelson left her in the bathroom.

{¶33} Nelson explained that A.J. looked "fast," like she was a prostitute, but he denied that he and Ruffin promised her money for sex. Nelson further said that "fast" meant "slutty."

{¶34} When the police came, Nelson told them, "I didn't sexually assault nobody," and "I didn't touch that white girl." Regarding the first comment, Nelson testified that he meant he did not force someone to have sex. Nelson explained that the second comment meant that he did not touch the woman because she gave oral sex to him; he said that he did not touch her during the act of oral sex. Nelson also testified that he offered to take a polygraph exam several times.

{¶35} The trial court found Nelson not guilty of rape, but guilty of the lesser included offense, sexual assault, a third-degree felony, and not guilty of kidnapping, but guilty of the lesser-included offense, abduction, a second-degree felony, with a sexual motivation specification. The trial court merged the offenses for purposes of sentencing. The state elected to proceed on sexual battery.

{¶36} The trial court sentenced Nelson to 30 months in prison for sexual battery.

The court further advised Nelson that he would be subject to a mandatory period of five years of postrelease control and be labeled a Tier III sex offender. It is from this judgment that Nelson now appeals.

{¶37} We will address Nelson's assignments of error out of order for ease of discussion.

## II. Sufficiency of the Evidence

{¶38} In his third assignment of error, Nelson argues that the state failed to present sufficient evidence for the trier of fact to find him guilty of second-degree felony abduction. He contends that to be convicted of second-degree felony abduction, the state had to prove beyond a reasonable doubt that he held the victim in "involuntary servitude," and that it failed to do so. We agree.

{¶39} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶40} The trial court found Nelson guilty of second-degree felony abduction under

R.C. 2905.02(B) and 2905.02(A)(3).   R.C. 2905.02(B) provides that "[n]o person, with a sexual motivation, shall violate division (A) of this section."   Division (A) states that "[n]o person, without privilege to do so, shall knowingly do any of the following:

> (1) By force or threat, remove another from the place where the other person is found;

> (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear;

> (3) Hold another in a condition of involuntary servitude.

{¶41} R.C. 2905.02(C) sets forth the level of felony for abduction depending on the particular division of the statute:

> A violation of division (A)(1) or (2) of this section or a violation of division (B) of this section involving conduct of the type described in division (A)(1) or (2) of this section is a felony of the third degree.   A violation of division (A)(3) of this section or a violation of division (B) of this section involving conduct of the type described in division (A)(3) of this section is a felony of the second degree.

{¶42} We note that when the trial court read its findings of guilt into the record, the state and defense counsel argued with the court that abduction as a lesser-included offense of kidnapping in this case would be a third-degree felony, not a second-degree felony.   But the trial court disagreed, and entered a finding that Nelson was guilty of second-degree felony abduction.

{¶43}    Until March 24, 2011, a violation of any of the three subsections of the abduction statute, R.C. 2905.02(A)(1), (2), or (3), was only a felony of the third degree.   *See* former R.C. 2905.02.   But on December 10, 2010, the General Assembly enacted

Am.Sub.S.B. No. 235; Ohio's first "stand-alone" bill criminalizing human trafficking. Rocha, *Our Backyard Slave Trade: The Result of Ohio's Failure to Enact Comprehensive State-Level Human-Sex Trafficking Legislation*, 25 J.L. & Health 381 (2012) ("Our Backyard"). One catalyst that motivated Ohio lawmakers to pass this bill "stemmed from a report conducted by the Ohio Trafficking in Persons Study Commission, which identified Ohio as a 'hub' for human trafficking." *Id*. at 383. The report highlighted several factors that contributed to Ohio's human trafficking problem. Subsequent to this report, which generated local media coverage, "Ohio held its first Human Trafficking Awareness Day at the Ohio Statehouse." *Id*.

{¶44} Before the legislature enacted this bill, Ohio's only antitrafficking penal-code provision consisted of a sentencing enhancement provision that was so complex, it was rarely, if ever, used.[1] *See* Our Backyard at 384. Ohio's new antitrafficking law, however, that was enacted in Am.Sub.S.B. No. 235, "defines involuntary servitude, amends the conspiracy and corruption statutes to include human trafficking, strengthens punishment for human trafficking by making labor and sex trafficking a second-degree felony punishable by up to eight years in prison; and increases penalties for compelling prostitution of minors." *Id*.

---

[1]R.C. 2941.1422(A) provides that "[i]mposition of a mandatory prison term under division (B)(7) of section 2929.14 of the Revised Code is precluded unless the offender is convicted of or pleads guilty to a felony violation of section 2905.01, 2905.02, 2907.21, 2907.22, or 2923.32, division (A)(1) or (2) of section 2907.323, or division (B)(1), (2), (3), (4), or (5) of section 2919.22 of the Revised Code and unless the indictment, count in the indictment, or information charging the offense specifies that the offender knowingly committed the offense in furtherance of human trafficking."

**{¶45}** R.C. 2905.02(D) provides that "involuntary servitude" has the same meaning as in R.C. 2905.31. R.C. 2905.31 was enacted in December 2010, as part of Am.Sub.S.B. 235. R.C. 2905.31(A) states that "involuntary servitude" means "being compelled to perform labor or services for another against one's will."

**{¶46}** The trial court found that under the facts of this case Nelson forced the victim to perform a service (giving oral sex to Nelson) against her will, and thus, held her in "a condition of involuntary servitude." Although we understand the trial court's reasoning, we must look to the intent of the legislature when it enacted Am.Sub.S.B. No. 235 to interpret the phrase "involuntary servitude" in the context of the abduction statute.

**{¶47}** There is not a lot of case law interpreting the phrase "involuntary servitude" as an element of abduction either before or after the General Assembly enacted Am.Sub.S.B. No. 235. And we could not find any cases addressing the definition of "involuntary servitude" as set forth in R.C. 2905.31.

**{¶48}** Human trafficking legislation is rooted in the Thirteenth Amendment of the United States Constitution. *See* Our Backyard at 391. The Thirteenth Amendment provides: "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." Similarly, the Ohio Constitution states that "[t]here shall be no slavery in this state; nor involuntary servitude, unless for the punishment of crime."

**{¶49}** Courts have defined the phrase "involuntary servitude" to person's claims

under the Thirteenth Amendment in various contexts. In *U.S. v. Kozminski*, 487 U.S. 931, 943-944, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988), the United States Supreme Court explained that "involuntary servitude" exists if a person is forced to work "by the use or threatened use of physical or legal coercion." *Id*. at 944.

{¶50} In *Rowe v. Elyria*, 38 Fed.Appx. 277 (6th Cir.2002), a property owner complained, inter alia, that enforcement of a city mowing ordinance subjected him to involuntary servitude in violation of the Thirteenth Amendment to the United States Constitution. The property owner complained that forcing him to mow the grass or pay a fine could be characterized as a "badge or incident of slavery." *Id.* at 283. Citing *Kozminski*, the Sixth Circuit explained that while the Thirteenth Amendment was not limited to the abolishment of African slavery, the phrase "involuntary servitude" was intended to cover forms of compulsory labor akin to African slavery that "in practical operation would tend to produce like undesirable results." *Id*. The Sixth Circuit concluded:

> While we have not located any cases discussing the imposition of charges for failing to maintain property, we conclude that even if the tree lawn is owned by the city enforcement of the mowing ordinance does not involve the kind of compulsion that would constitute involuntary servitude under the Thirteenth Amendment.

*Id*.

{¶51} The court in *Midwest Retailer Associated, Ltd. v. Toledo*, 563 F.Supp.2d 796 (N.D.Ohio 2008), expressed a similar interpretation of the phrase "involuntary servitude," stating that "[t]he contemporary view is that involuntary servitude claims, to be

cognizable, relate to extreme cases, such as labor camps, isolated religious sects, and forced confinement." *Id*. at 809.

{¶52} Although these cases shed light on the meaning of the phrase, "involuntary servitude," we will now turn to Am.Sub.S.B. No. 235 and its purpose to determine the meaning of the phrase within the abduction statute.

{¶53} In Our Backyard, Rocha explained that human trafficking is defined as the:

> [r]ecruitment, transportation, transfer, harbouring, or receipt of persons by means of threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation.

Our Backyard at 385, citing *Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime*, G.A Res. 25, Annex II, U.N.GAOR, 55th Sess., Supp. No. 49, at 2 (Nov. 15, 2000) (establishing the first international comprehensive antitrafficking guidelines).

{¶54} R.C. 2929.01(AAA) states that "human trafficking" means, inter alia, a scheme or plan that's "object" includes in part (there are several others as well):

> To subject a victim or victims to involuntary servitude, as defined in section 2905.31 of the Revised Code or to compel a victim or victims to engage in sexual activity for hire, to engage in a performance that is obscene, sexually oriented, or nudity oriented, or to be a model or participant in the production of material that is obscene, sexually oriented, or nudity oriented[.]

{¶55} Rocha further explains in Our Backyard:

Sex trafficking occurs in various forms: prostitution, sexual entertainment, sexual servitude, exotic dancing, pornography, and servile marriage. A "commercial sex act" is defined as "any sexual act in which something of value is given or received." Sex traffickers compel victims to provide sexual acts through a variety of coercive measures, including the use of brutal violence, threats of deportation, and threats of violence against family members. Human trafficking is not a crime of movement. Trafficking does not require that the victim be transported from one location to another; rather, trafficking refers to the elements of "fraud, force, or coercion" that result in the victim's inability to escape the traffickers' control.

* * *

Human trafficking victims are often referred to as the "hidden population." Statistics on trafficked victims are difficult to obtain due to the inherently underground nature of trafficking[.] * * * Traffickers compel victims into sexual slavery through a myriad of control mechanisms. Human trafficking can be either sex trafficking or labor trafficking. Labor trafficking may consist of forced labor, debt bondage, involuntary domestic servitude, and forced child labor. Human sex trafficking differs from prostitution because sex trafficking refers to forced sexual acts while prostitution refers to sexual acts between consensual adults. As such, prostitution by willing adults is not human trafficking.

* * *

Human trafficking is a lucrative business in which traffickers reap substantial profits from the dehumanization of victims. It ranks as the second largest illegal enterprise in the world, following the illegal sale of drugs. The figures help explain why traffickers are compelled to continue treating human beings as commodities.

[Because of this serious domestic and global problem], [t]he Department of Justice laid the groundwork for states in 2008 by creating a Model State Human Trafficking Criminal Statute. Several non-governmental organizations also proposed model anti-trafficking statutes. Nearly all fifty states heeded the call to criminalize human trafficking at the state level. As of December 2010, Ohio was finally added to the list of states that criminalize human trafficking.

* * *

Human sex trafficking is fueled by market demand; as long as traffickers have a financial incentive, they will enslave victims. Human sex trafficking is attractive to traffickers because unlike drugs or weapons, which are one-time transactions, humans as products can be sold and resold repeatedly by forcing victims to prostitute themselves to multiple customers. Accordingly, the human sex-trafficking industry rewards traffickers for treating humans like commodities and for repeatedly victimizing them. Awards of high punitive damages are appropriate to punish and deter such egregious conduct. Subjecting victims to repeated acts of physical, psychological, and sexual abuse warrants punishment commensurate with the crime.

*See* Our Backyard at 385-417.

**{¶56}** In light of the serious issue of human trafficking and the purpose behind the enactment of Am.Sub.S.B. No. 235, we agree with Nelson that the trial court incorrectly found that he was guilty of second-degree felony abduction because he did not "[h]old another in a condition of involuntary servitude" within the meaning of the statute.

**{¶57}** Again, involuntary servitude means "being compelled to perform labor or services for another against one's will." R.C. 2905.31(A). Compelling "labor" or "services" implies an ongoing offense, multiple acts or multiple times. By holding this, we are not establishing any particular time constraints in R.C. 2905.31(A). But we are saying that in this case, Nelson forcing the victim to give him oral sex — an act that took place one time and lasted less than an hour — does not amount to Nelson holding the victim in a condition of "involuntary servitude."

**{¶58}** Thus, we agree with Nelson that the trial court erred when it found Nelson guilty of second-degree felony abduction.

**{¶59}** Nonetheless, we do find that the state presented sufficient evidence to find

Nelson guilty of third-degree felony abduction under R.C. 2905.02(B) and 2905.02(A)(2), which respectively provide that "no person with a sexual motivation shall violate division (A) of this section," and no person, without privilege to do so, shall knowingly "[b]y force or threat, restrain[s] the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]" *See* R.C. 2945.79(D); *see also State v. Frazier*, 10th Dist. Franklin No. 05AP-1323, 2007-Ohio-11, ¶ 28-29; *State v. Davis*, 8th Dist. Cuyahoga No. 71853, 1997 Ohio App. LEXIS 5674 (Dec. 18, 1997) (where a reviewing court finds insufficient evidence of degree of crime that defendant was found guilty of, but sufficient evidence of "a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly").

{¶60} We note that the trial court does not need to resentence Nelson on this abduction modification because the trial court merged abduction and sexual battery for purposes of sentencing. The state chose to proceed on sexual battery (even though at the time of sentencing, Nelson had been found guilty of second-degree abduction, which was a higher level felony than sexual battery, a third-degree felony). Therefore, upon remand, the trial court should correct the judgment entry to reflect that Nelson is guilty of abduction in violation of R.C. 2905.02(B) and 2905.02(A)(2), a felony of the third degree.

**Response to the Concurring in Part and Dissenting in Part Opinion**

{¶61} According to the concurring in part and dissenting in part opinion

("dissenting opinion"), we should not address the sufficiency of the abduction evidence because any error with respect to abduction would be harmless. We disagree.

{¶62} First, we disagree that a finding of guilt to a second-degree felony — when the evidence *only* supports a finding of guilt to a third-degree felony — would ever be harmless.

{¶63} Second, we disagree with the dissenting opinion that *Powell* supports its position. The dissenting opinion is relying on one paragraph of *dicta* in an Ohio Supreme Court death penalty appeal, *State v. Powell*, 49 Ohio St.3d 255, 552 N.E.2d 191 (1990). There, the Supreme Court stated the following:

> Even if we held the evidence somehow insufficient as to Count Three (charging kidnapping by restraint), it was clearly sufficient as to Count Four (charging kidnapping by removal). Since the trial court merged the kidnapping convictions with one another, Powell received only one sentence for kidnapping, and an erroneous verdict on Count Three would be harmless beyond a reasonable doubt. Thus, a finding of error on Count Three could not affect the sentence. Powell's sixth proposition of law is overruled.

*Id.* at 263.

{¶64} Notably, however, the Supreme Court made that statement *after* it had already addressed the defendant's argument that the two kidnapping offenses lacked sufficient evidence; it found that there was sufficient evidence. Thus, the statement was merely dicta — with no legal force at all. We further note that the Supreme Court has cited to *Powell* 27 times, but never for the proposition that the dissenting opinion is suggesting.

{¶65} Again, *Powell* was a death penalty case — involving the aggravated murder,

attempted rape, and kidnapping of a seven-year-old girl. The defendant tricked the child into leaving her front yard to follow him to a nearby building. Once there, he took the girl to the fourth floor and made her take off her clothes. He later told police that he intended to have sex with her. Before he could, however, the girl's grandfather came looking for her. When the defendant heard the grandfather coming, he picked the child up and threw her out of the fourth-floor window. She died the next day. Taking one paragraph from *Powell* to deny a defendant his right to appeal the state's evidence against him is simply wrong.

{¶66} Moreover, *Powell* was decided in 1990 — over 27 years ago. Since then, the Supreme Court has issued a plethora (to say the least) of decisions on allied offenses of similar import, which call into question its dicta statement in *Powell*. Particularly, in *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, the Ohio Supreme Court held that "a 'conviction' consists of a guilty verdict and the imposition of a sentence or penalty." *Id.* at ¶ 12, citing *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047. The court concluded that "[b]ecause R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains in tact, both before and after the merger of allied offenses for sentencing." *Id.* at ¶ 27.

{¶67} The Ohio Supreme Court has even recognized that when a trial court orders that two sentences on allied offenses be served concurrently, a defendant is prejudiced by having more convictions than are authorized by law — meaning the error is not harmless.

*State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 31. Thus, how can a guilty finding to a second-degree felony be harmless error when the defendant can only be guilty of a third-degree felony? It is our view that it never could be harmless.

{¶68} In *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, this court cited to *Powell* for the same proposition the dissenting opinion does, but we pointed out the contradiction between *Powell* and *Whitfield*, stating the following:

> We confess to some unease over these holdings: the Supreme Court has held that "[b]ecause R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 27. This could become an issue if, at some point after appeal, the count into which the allied offense was merged is vacated. Suppose facts similar to this case but the aggravated murder conviction is vacated post-appeal — what would happen to the allied offenses that were merged for sentencing? If the defendant was not sentenced on them, he was technically not "convicted" of those offenses. Would those offenses just disappear? Or would the defendant be subject to sentencing on the remaining counts, having been denied the opportunity to contest the sufficiency of the evidence? It might be that the defendant would have the opportunity to appeal any conviction that stemmed from the imposition of a sentence for one or more offenses of which the defendant was found guilty, but merged.

*Id*. at ¶ 17.

{¶69} We acknowledge those Eighth District cases cited by the dissenting opinion, as well as the cases from other districts, that have cited *Powell* for the proposition that an appellate court need not address the sufficiency of the evidence of an allied offense that merged into another offense. But we note that this court has also addressed the

sufficiency of the evidence of an allied offense even though the state elected to have the defendant sentenced on the other allied offense. In *State v. Brown*, 8th Dist. Cuyahoga No. 98540, 2013-Ohio-1982, the defendant was convicted of attempted rape, kidnapping, and theft. The trial court found that the attempted rape and kidnapping offenses were allied offenses of similar import and the state elected to proceed on kidnapping for purposes of sentencing.

{¶70} On appeal, Brown challenged the sufficiency of the evidence of his attempted rape and kidnapping convictions. This court went into a lengthy analysis regarding the evidence of the attempted rape charge — despite the fact that this offense merged into the kidnapping offense. We even cited to *Powell*, 49 Ohio St.3d 255, 552 N.E.2d 191, stating that "the [*Powell*] court found a defendant's order for the victim to undress was strongly corroborative of his intent to rape her because he confessed he was going to have sex with her." But nowhere did we mention that *Powell* stood for the proposition that we need not address the sufficiency of an offense because it merged into another offense.

{¶71} It is our view that *Brown* correctly addressed the sufficiency of the defendant's finding of guilt on an offense despite the fact that the offense merged into another offense for purposes of sentencing.

{¶72} Accordingly, Nelson's third assignment of error is sustained.

## III. Lesser-Included Offense

{¶73} In his second assignment of error, Nelson argues that the trial court erred

when it found that abduction was a lesser-included offense of kidnapping because "involuntary servitude" is an element that the state did not need to meet under the indicted offense. This assignment of error, however, has been rendered moot by our disposition of Nelson's third assignment of error. Nelson does not argue that third-degree felony abduction under R.C. 2905.02(A)(2) is not a lesser-included offense of kidnapping, and thus, we will not sua sponte raise it. Nelson's second assignment of error is overruled.

**IV. Manifest Weight of the Evidence**

{¶74} In his first assignment of error, Nelson argues that his convictions were against the manifest weight of the evidence.

{¶75} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

{¶76} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered.'" *Id.,* quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶77}** Nelson contends that the trial court, as the factfinder, lost its way because the victim "was simply not a believable person." He claims (1) that the victim's version of events was "contradictory with itself," (2) that her "backstory proved entirely untrue," (3) that the reason she even walked over to the porch where Nelson and Ruffin were sitting "was entirely unreasonable" (stating that she had the "urge" to urinate, but then never urinated until she got to the hospital three hours later), (4) that even her friends and family did not support her, (5) that she did not call 911 right away and did not even leave the scene (because she only walked a block from the house where she said she was raped), and (6) that she had untreated mental illness.

**{¶78}** While we acknowledge that not every aspect of the victim's testimony was consistent or entirely convincing, neither was Nelson's version of the events.

**{¶79}** And although the victim's testimony regarding events leading up to and after the incident in the bathroom was contradicted by some of the evidence, her testimony as to what occurred when she approached the porch with the two men on it, the reason as to why she approached them, and what occurred in the bathroom was the same as what she relayed to LaRicha, the police officers, the paramedic, the detective, and the

SANE nurse.

{¶80} We further note that the trial court made it clear that it had a hard time believing that Nelson simply thought that he could walk into the bathroom, where Ruffin and the victim were having sex, and take part in a "threesome" without having ever exchanged any words with the victim or Ruffin ahead of time. The trial court, as the trier of fact, heard all of the testimony in this case, as well as the inconsistencies in the victim's version of the events and Nelson's version of the events, and ultimately chose to believe the victim over Nelson.

{¶81} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The trier of fact may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶82} After reviewing the entire record in this case, weighing the evidence and all reasonable inferences, considering the credibility of the witnesses and resolving the

conflicts in the evidence, we conclude that the trier of fact did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. This is simply not the "exceptional case" where "the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

**{¶83}** Nelson's first assignment of error is overruled.

## V. Court Costs

**{¶84}** In his fourth assignment of error, Nelson contends that the trial court erred when it imposed costs in the sentencing entry without orally imposing costs at the sentencing hearing. Although the state concedes this error, we disagree.

**{¶85}** R.C. 2947.23(A)(1) governs the imposition of court costs and provides in relevant part: "In all criminal cases * * * the judge * * * shall include in the sentence the costs of prosecution * * * and render a judgment against the defendant for such costs." Thus, a sentencing court must include in the sentence the costs of prosecution and render a judgment against the defendant for costs, even if the defendant is indigent. *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 8. In its discretion, a trial court may waive court costs if the defendant is indigent. *State v. Walker*, 8th Dist. Cuyahoga No. 101213, 2014-Ohio-4841, ¶ 9.

**{¶86}** Nelson relies on *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, in support of his argument. In *Joseph*, the trial court imposed costs without mentioning them at the sentencing hearing. The Ohio Supreme Court accepted jurisdiction on the following issue: "May a trial court impose court costs pursuant to R.C.

2947.23 in its sentencing entry, when it did not impose those costs in open court at the sentencing hearing?" *Id*. at ¶ 8.

{¶87} In analyzing the issue, the Supreme Court explained that it had previously held that a motion to waive costs by an indigent defendant must be made at the time of sentencing. *Id*. at ¶ 12, citing *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164. If a defendant did not do so, then the issue was waived and costs would be considered res judicata. *Id*. at ¶ 12, citing *Threatt* at ¶ 23. The Supreme Court reasoned in *Joseph* that if a trial court did not orally notify a defendant about costs at the sentencing hearing, it deprived a defendant of the opportunity to request that the court waive costs. *Id.* at ¶ 13. The court explained:

> Crim.R. 43(A) states that a criminal defendant must be present at every stage of his trial, including sentencing. The state urges that any error is harmless. However, Joseph was harmed here. He was denied the opportunity to claim indigency and to seek a waiver of the payment of court costs before the trial court. He should have had that chance.

*Id*. at ¶ 22.

{¶88} Based on this reasoning, the Supreme Court held that it was reversible error for the trial court to impose costs in its sentencing entry when it did not impose those costs in open court at the sentencing hearing. *Id*. at ¶ 1. The court's remedy was to remand the case for the limited purpose of allowing the defendant to move the court for waiver of costs. *Id*. at ¶ 23.

{¶89} Subsequent to *Joseph*, however, the General Assembly amended R.C. 2947.23 in Am.Sub.H.B. 247, which was effective March 22, 2013. The Ohio

legislature added a new provision in subsection (C), which states: "The court retains jurisdiction to waive, suspend, or modify the payment of the costs of prosecution, including any costs under section 2947.231 of the Revised Code, at the time of sentencing or at any time thereafter." According to this provision, a defendant is no longer required to move to waive costs at the time of sentencing. Therefore, *Threatt* has been superseded by statute, and the holding in *Joseph* is no longer applicable. Further, despite Crim.R. 43(A) requiring the defendant to be present at every stage of his trial, which includes sentencing, we find that any error is harmless because Nelson — unlike the defendant in *Joseph* — has not been denied the opportunity to claim indigency and seek a waiver of costs. *See State v. Thomas*, 8th Dist. Cuyahoga No. 104567, 2017-Ohio-4436 (because R.C. 2947.23(C) permits a defendant the opportunity to seek a waiver of court costs at any time, any error in failing to advise a defendant of court costs at the time of sentencing is harmless).

{¶90} Accordingly, Nelson's fourth assignment of error is overruled. Nelson may move the court to waive costs at any time.

## VI. Conclusion

{¶91} We agree with Nelson that the trial court erred when it found him guilty of second-degree felony abduction because Nelson did not hold the victim in "involuntary servitude." Nelson is guilty, however, of felony-three abduction under R.C. 2905.02(B) and 2905.02(A)(2), and we modify his finding of guilty accordingly.

{¶92} Because we found that Nelson is not guilty of second-degree felony

abduction, Nelson's argument that abduction with the element of "involuntary servitude" cannot be a lesser-included offense of kidnapping is moot.

{¶93} We further find that Nelson's convictions are not against the manifest weight of the evidence because Nelson's arguments are based solely on the credibility of the victim, which we defer to the trial court, who as the finder of fact was able to observe the witnesses' demeanor and decide who was more credible.

{¶94} Finally, we find no merit to Nelson's argument that the trial court erred when it imposed costs without orally notifying him at the sentencing hearing because Nelson can move the court to waive costs at any time.

{¶95} Judgment affirmed in part and reversed in part. Case remanded for the trial court to correct the judgment entry and modify Nelson's abduction conviction to abduction in violation of R.C. 2905.02(B) and 2905.02(A)(2), a felony of the third degree (although Nelson does not need to be resentenced on this crime because the state chose to proceed on sexual battery, also a third-degree felony).

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MARY J. BOYLE, JUDGE

MARY EILEEN KILBANE, P.J., CONCURS;
SEAN C. GALLAGHER, J., CONCURS IN PART AND DISSENTS
IN PART WITH SEPARATE OPINION


SEAN C. GALLAGHER, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶96} I concur in part and dissent in part. The trial court merged the sexual battery and abduction counts before sentencing Nelson. The state elected to convict Nelson of sexual battery, and therefore, he was not convicted of abduction. A conviction consists of both the finding of guilt and the sentence. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 12. As the Ohio Supreme Court has repeatedly stated, "a challenge to the sufficiency of the evidence *supporting a conviction* requires that [courts] consider 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" (Emphasis added.) *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 74, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. ("An appellate court's function when reviewing the sufficiency of the evidence *to support a criminal conviction* is to * * *.") Any error with respect to the sufficiency of the evidence supporting the finding of guilt for abduction is necessarily harmless in light of the fact that Nelson failed to challenge the sufficiency of the evidence supporting the sexual battery conviction. *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191

(1990) (even if evidence of one count was insufficient to support the conviction, the fact that the count merged with another that was supported by sufficient evidence means any error was harmless beyond a reasonable doubt); *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23.[2]

**{¶97}** More important, the majority's decision conflicts with precedent from this district. *Worley*; *State v. Wilson*, 8th Dist. Cuyahoga No. 104333, 2017-Ohio-2980, ¶ 67; *State v. Zimmer*, 8th Dist. Cuyahoga No. 104946, 2017-Ohio-4440, ¶ 9; *State v. Franks*, 8th Dist. Cuyahoga No. 103682, 2016-Ohio-5241, ¶ 18; *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14; *State v. Hubbard*, 8th Dist. Cuyahoga No. 97118, 2012-Ohio-1052, ¶ 29. Nelson has not asked for en banc review of those decisions. I would follow our precedent rather than creating an unnecessary conflict of law in this district that puts us at odds with a majority of districts in the state. *State v. Obsaint*, 1st Dist. Hamilton No. C-060629, 2007-Ohio-2661, ¶ 24; *State v. Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 57 (2d Dist.); *State v. Gervin*, 3d Dist. Marion No. 9-15-52, 2016-Ohio-8399, ¶ 139, fn. 7; *State v. Wickersham*, 4th Dist. Meigs No. 13CA10, 2015-Ohio-2756, ¶ 21; *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-2897, ¶ 70; *State v. Montgomery*, 10th Dist. Franklin No. 13AP-512, 2014-Ohio-4354, ¶ 39; *State v. Payne*, 11th Dist. Ashtabula No. 2014-A-0001,

---

[2]To be clear, the above only applies to situations in which the actual conviction is supported by sufficient evidence or the defendant fails to challenge the sufficiency of the evidence supporting the conviction in the direct appeal. I am not intending to resolve any other issue aside from the one presented in this appeal.

2014-Ohio-4304, ¶ 17.

{¶98} Further, *State v. Brown*, 8th Dist. Cuyahoga No. 98540, 2013-Ohio-1982, does not stand for the proposition that an appellate court may reverse a finding of guilt for lack of sufficient evidence. Although *Brown* noted that the rape and kidnapping offenses merged and the state elected to sentence on the kidnapping charge, the panel believed that the defendant was "convicted" of rape. *Id.* at ¶ 15 ("Brown was convicted of attempted rape in violation of R.C. 2923.02 and R.C. 2907.02(A)(2).") A guilty verdict or finding of guilt is not synonymous with "conviction," which is a well-defined term that includes both the finding of guilt and the sentence. A sufficiency of the evidence challenge examines the evidence supporting the criminal conviction. *Jenks*, paragraph two of the syllabus. The analysis in *Brown* was therefore dicta — it was not necessary for the resolution of the appeal.

{¶99} Further, *Brown* affirmed the "conviction." It is one thing to offer alternative analysis as a basis to affirm a conviction; it is another altogether to actually reverse a finding of guilt on sufficiency grounds for the merged count, when most courts condemn the argument as being harmless error after the actual conviction is affirmed. Tellingly, Nelson has not offered any authority to support a reversal. App.R. 16(A)(7).

{¶100} I concur in part and dissent in part.